UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-10183-MLW |
| | ) | |
| JASON OWENS | ) | |

DEFENDANT'S MOTION FOR
REVOCATION OF DETENTION ORDER

Pursuant to 18 U.S.C. § 3145(b), defendant, Jason Owens, moves the Court to revoke the

detention order issued by Magistrate Judge Sorokin, and to release Mr. Owens on suitable

conditions.  There are reasonable conditions of release available to the Court that will assure

against any perceived danger to the community or any other person if Mr. Owens is released.  In

support of this motion, Mr. Owens relies on the documents attached hereto, the Pretrial Services

Report, and the documents submitted under a Motion to Seal dated August 7, 2005,[1] and further

states as follows:

Factual and Procedural Background

Mr. Owens is 32 years old.  For the last several years, Mr. Owens has been extremely

involved with Alcoholics Anonymous, regularly attending meetings, working to maintain his

own sobriety and greatly assisting numerous others to remain sober, including setting up new

meetings for young people.  Over this period, Mr. Owens has worked as a union iron worker and

a livery driver, but has always found time to help others in their recovery.

On June 17, 2005, Mr. Owens was first brought before the Court on a Criminal

Complaint charging him with violation of the Hobbs Act and aiding and abetting, in violation of

---

[1]     Although this motion is filed by CM/ECF, the Motion to Seal, with its
attachments, is being filed by hand delivery.

18 U.S.C. §§ 1951(a) and 2.  The Affidavit of Laurence Travaglia ("Travaglia Aff.") submitted

in support of the Complaint, stated that on April 26, 2005 a cooperating witness ("CW"), with a

very long criminal record, Travaglia Aff. ¶ 4 n. 1, told law enforcement that he had learned from

Mr. Owens that four others, including Dennis Quirk ("Quirk") and Martin O'Brien ("O'Brien"),

but not including Mr. Owens, intended to rob an armored car the next day (April 27), id. ¶ 4(a);

that Mr. Owens had showed him (the CW) a bag with 2 or 3 bullet proof vests and three guns in

it that Mr. Owens said he was holding for the people planning the armored car robbery for the

next day, id.; that the individuals who were going to do the robbery were planning to go back to

Mr. Owens' apartment after the robbery, id. ¶ 4(c); and that Mr. Owens was supposed to receive

$2,500 for holding the weapons.  Id. ¶ 4(d).  No armored car robbery occurred on April 27.  Id.

4(e).  On May 3, the CW had a conversation with Mr. Owens during which Mr. Owens indicated

that he had sold the guns to one of the participants in the planned armored car robbery and not

merely held them.[2]  Id. ¶ 4(f).  On June 16, 2005, there was an attempted armored car robbery in

the North End of Boston.  Id. ¶ 5.  The description of one of the guns observed during that

attempted robbery appeared similar to the description given by the CW of one of the guns the

CW had been shown by Mr. Owens.  Id. ¶ 8.  Shortly after the attempted armored car robbery,

Quirk and O'Brien were seen in the vicinity of Mr. Owens' apartment.  Id. ¶ 7.

At the initial appearance, the government moved for detention under 18 U.S.C. §§

3142(f)(1)(A) (a crime of violence), (f)(1)(D) (a felony by a person with two or more convictions

---

[2]    There is no evidence to suggest that this statement was true or was anything other than a way for Mr. Owens to avoid telling the CW any other information.  See Transcript of Detention Hearing ("Tr."), a copy of which is attached as Exhibit A, at 6-7.

for particular offenses), and (f)(2)(a) (risk of flight).  No presumptions of detention set out in 18

U.S.C. § 3142(e) apply.

Mr. Owens was preliminarily detained pending a detention hearing.  During this

preliminary detention -- from June 17 until the detention hearing on June 27 -- Mr. Owens was

held by the U.S. Marshal's Service at MCI-Cedar Junction.  During virtually the entire time Mr.

Owens was at MCI-Cedar Junction, the facility was in a lock-down status due to disturbances in

other parts of the facility.  As a result, Mr. Owens was unable to telephone counsel or his family,

or assist in compiling information to be used in connection with the scheduled detention hearing.

At the preliminary examination and detention hearing on June 27, 2005, Mr. Owens,

through counsel, conceded probable cause, but clarified three points:  (1) that the government did

not believe Mr. Owens had participated in the attempted armored car robbery; (2) that the

government's theory was not that Mr. Owens put the guns in his apartment, but only allowed

others access to the room; and (3) the government has no independent evidence to suggest that

Mr. Owens actually sold the guns to those who were planning the armored car robbery.  Tr. at 6-

8.  Mr. Owens then urged the Court to release him to electronically monitored home detention at

his mother's house, with his mother (who is not working outside the home) serving as third-party

custodian.  Pretrial services had previously found Mr. Owens' mother to be a suitable third-party

custodian.  Mr. Owens' mother also offered to post her house, with approximately $300,000 in

equity, as security for Mr. Owens' compliance with all of his release conditions, not simply his

agreement to appear in court.  Id. at 11-13.

On June 29, 2005, Magistrate Judge Sorokin issued a Memorandum and Order ("Mem."),

a copy of which is attached as Exhibit B.  In his Memorandum and Order, the magistrate judge

ordered Mr. Owens detained based on the finding that "[n]o condition or combination of

conditions in this case will reasonably assure the safety of the community and any other person."
<u>Mem</u>. at 4.  The magistrate judge denied the government's motion for detention on the "risk of flight" ground.  <u>Id</u>.

ARGUMENT

The Court Should Revoke The Magistrate Judge's<br><u>Detention Order And Release Mr. Owens On Conditions</u>

Under the Bail Reform Act, "[i]f a person is ordered detained by a magistrate judge . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation . . . of the order.  The motion shall be determined promptly."  18 U.S.C. § 3145(b).  As this Court has written, in reviewing a magistrate judge's detention order, "the court must undertake an independent review, giving [the magistrate judge's] decision such deference as the care and consideration manifested by the magistrate judge warrant."  <u>United States v. Simone</u>, 317 F. Supp. 2d 38, 42 (D. Mass. 2004).

Before a defendant can be detained due to a risk of danger, "clear and convincing" evidence is required that no set of conditions will reasonably assure the safety of any other person or the community.  The standard, however, does not require an "absolute[ ] guarantee[ ]" of community safety.  Courts can look only for "an 'objectively reasonable assurance of community safety.'"  <u>Id</u>., <u>quoting</u> <u>United States v. Tortora</u>, 922 F.2d 880, 884 (1st Cir. 1990).

In this case, the magistrate judge issued a relatively brief written decision, relying in large measure on the allegations relating to Mr. Owens' participation in the charged offense.  The magistrate judge fails to explain, however, why, by clear and convincing evidence, the proposed release conditions are not sufficient to give an objectively reasonable assurance of community safety.  Just as the Court found in <u>Simone</u>, in this instance the deference due the magistrate

4

judge's decision is "limited" because here the magistrate judge did not adequately consider a number of factors.

First, the magistrate judge did not -- indeed could not -- consider the full scope of Mr. Owens' involvement with Alcoholics Anonymous, and the network of support he has built over the last five year.  As a result of Mr. Owens' lock-down status at MCI-Cedar Junction, he was not able adequately to bring this involvement to the magistrate judge's attention.  Attached to the Motion to Seal, submitted in support of this motion, are more 15 letters attesting to Mr. Owens' important role in the lives of so many people who are struggling with addition.  This factor, coupled with the government's allegations that Mr. Owens' role in the charged offense was relatively peripheral, suggest a much reduced risk of danger to the community or any other person than was found by the magistrate judge.

Second, the magistrate judge mistakenly read the Complaint as alleging that Mr. Owens had held the guns in question for more than six weeks leading up the attempted armed robbery. See Mem. at 2.  This mis-reading of the Complaint suggested a much greater involvement by Mr. Owens than is in fact alleged by the government.  The government alleges only that Mr. Owens had the guns shortly before April 27.  Travaglia Aff. ¶ 4(a).  There is no evidence that Mr. Owens held them from April 27 until June 16, nor can such an inference fairly be drawn from the information before the magistrate judge.

Third, the magistrate judge did not adequately consider alternative conditions that could be imposed to safeguard the community and other persons.  The magistrate judge did not explain why, despite the conditions proposed by the defense -- electronically monitored home detention with, and in the third-party custody of, his mother, all secured by $300,000 in equity in his mother's home -- Mr. Owens would still clearly and convincingly pose a danger to the

5

community or other people.  Even if the fundamental concern, albeit unstated by the magistrate

judge, was that Mr. Owens could have people visit him at his mother's house, or could offer

them refuge there, an additional condition that limits visits to Mr. Owens' mother's house other

than when Mr. Owens' mother is present would address that concern.

Conclusion

For these reasons, Mr. Owens requests the Court to independently review the issue of Mr.

Owens' detention, and to revoke the magistrate judge's detention order and release Mr. Owens

on suitable conditions.

REQUEST FOR HEARING

Pursuant to Local Rule 7.1(D), Mr. Owens requests oral argument and further evidentiary

hearing on this motion.

JASON OWENS
By his attorney,

/ S /  Peter B. Krupp

Dated:  August 8, 2005                    Peter B. Krupp
                                            B.B.O. #548112
                                          Lurie & Krupp, LLP
                                          One McKinley Square
                                          Boston, MA  02109
                                          Tel:  617-367-1970

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**Magistrate No. 05-29-LTS**

UNITED STATES OF AMERICA             .
      Plaintiff             .

                        .

           v.             .

                        .

JASON OWENS             .
      Defendant             .

                        .

. . . . . . . . . . . . . .

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE
HELD ON JUNE 27, 2005

APPEARANCES:

For the government:

For the defendant:  Peter B. Krupp, Esquire, Lurie and Krupp, LLP, One McKinley Square, Boston, MA 02109, (617_ 367-1970

Court Reporter:  Robert E. Richardson, Esquire, United States Attorney's Office, Suite 9200, 1 Courthouse Way, Boston, MA 02210, (617) 748-3247.

Proceedings recorded by digital sound recording, transcript produced by transcription service.

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

1

## I N D E X

2 Proceedings                                                    3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1                    P R O C E E D I N G S

2    (Court called into session)

3            THE CLERK:  The Honorable Leo T. Sorokin presiding.

4    Today is June 27th, the case of the United States v. Owens.

5    Magistrate No. 05-29, will now be heard before this Court.

6            MR. KRUPP:  Mr. Owens has been interviewed by the

7    probate, pretrial and they are not yet here.

8            THE COURT:  Okay.

9            MR. KRUPP:  I have not seen them, but I did see the

10   report.

11           THE COURT:  You did see the report?

12           MR. KRUPP:  I did see the report.

13           THE COURT:  Do you need the - we'll get to that in a

14   minute.

15           MR. KRUPP:  Okay.

16   (Pause)

17           THE COURT:  Why don't you identify yourselves for the

18   record.

19           MR. RICHARDSON:  Robert Richardson for the United

20   States.  Good afternoon, your Honor.

21           THE COURT:  Good afternoon, Mr. Richardson.

22           MR. KRUPP:  Your Honor, Peter Krupp for Jason Owens.

23           THE COURT:  Good afternoon, Mr. Krupp.  Do you know

24   who did the interview?

25           MR. KRUPP:  Judith Oxford did the interview, but I

4

1    was told that she was not--

2                    THE COURT:  Oh, wait here they come.

3                    MR. KRUPP:  -- the person who was going to cover.

4                    THE COURT:  I know they're short staffed.  I just

5    want to make sure we get the report.

6                    PRETRIAL SERVICES:  Sorry, your Honor.

7                    THE COURT:  That's all right.  I know you guys are

8    busy.

9    (Pause)

10                   THE COURT:  I don't know if you all heard that.  What

11   the pretrial services officer just said was this is the report

12   done by Ms. Oxford of the interview with Mr. Owens and that

13   pretrial also interviewed Mr. Owens' mother just a few minutes

14   ago as a third party custodian interview, and they don't have a

15   written report of that and at the appropriate time of the

16   hearing we'll get an oral report.

17                   MR. KRUPP:  Okay.  Can I have a moment then to speak

18   with pretrial?

19                   THE COURT:  Sure.

20   (Pause)

21                   THE COURT:  Well, why don't you share with all of us

22   what your point of view is.

23                   PRETRIAL SERVICES:  Sorry, your Honor.

24                   THE COURT:  That's all right.

25                   PRETRIAL SERVICES:  After interviewing

5

1  Mr. Owens' mother, pretrial would find she is a suitable third

2  party custodian, and it would appear that the residential plan

3  is also suitable.  However, I'd still go with Ms. Oxford's

4  recommendations reflected in her pretrial services report of

5  detention based on the issues that she states in her assessment

6  of risk of flight and danger to the community.

7          THE COURT:  Okay.  Are we ready to proceed?

8          MR. KRUPP:  Yes.

9          THE COURT:  Mr. Richardson, are you ready?

10          MR. RICHARDSON:  Yes, your Honor.

11          THE COURT:  Why don't you - we're here for probable

12  cause and detention.

13          MR. KRUPP:  We are, your Honor.  With respect to

14  probable cause, as I did this morning with the earlier, the

15  other case that I handled this morning, I'm willing to

16  essentially concede probable cause.  I think that there should

17  be a couple of clarifications and perhaps Mr. Richardson's

18  willing to make those clarifications on the record with respect

19  to the complaint affidavit that your Honor has before you on

20  the question of probable cause, and then I will now just argue

21  detention to your Honor.  With respect to those

22  clarifications--

23          THE COURT:  Uh-huh.

24          MR. KRUPP:  -- and I don't know that it's clear from

25  the criminal complaint, but it is my understanding that it is

1   the government's theory that Mr. Owens was not a person w

2   was at the armored car.  The government's theory is essentially

3   that Mr. Owens permitted people to use his apartment to store

4   things and to go back to after an anticipated robbery but not

5   that Mr. Owens went to the armored car or threatened any

6   armored car guard, and so that would be one clarification.

7           The second is that it's my understanding that the

8   government's theory is not that Mr. Owens - and your Honor has

9   before you two cases related, the Quirk case and the Owens

10  case, the affidavits in both cases are identical.  In

11  connection with the Quirk case, there's representations to the

12  Court, I know your Honor's already had a hearing on it--

13          THE COURT:  Yep.

14          MR. KRUPP:  -- the representations to the Court that

15  weapons were found in the apartment or the room at the Silver

16  house where Mr. Owens was staying after the June 16 robbery,

17  and it's my understanding that the government's theory is not

18  that Mr. Owens put those there or that, or did anything other

19  than make that room available for somebody else who put them

20  there on June 16th--

21          THE COURT:  Uh-huh.

22          MR. KRUPP:  -- 2004.  And the last clarification I

23  think is that in the affidavit, paragraph 4f, as in Frank, the

24  center of that paragraph it says that in a conversation Owens

25  indicated to a CW that he had sold the guns to Quirk and not

7

1  merely held them.  And I don't believe the government has any

2  evidence to suggest that that's true or anything more than Mr.

3  Owens just trying not to tell the CW whose guns those were.

4        THE COURT:  I'm a little confused as to that one.

5  Are you saying you want to have - the way I understood that

6  paragraph when I read it that that paragraph is a summary of

7  what, of a conversation between the CW and Mr. Owens and that

8  in the conversation Mr. Owens indicated to the CW that he,

9  Mr. Owens, had sold the guns to Quirk and not merely held them.

10  Are you suggesting that the recorded conversation doesn't so

11  indicate?

12        MR. KRUPP:  No.  I'm suggesting that independent of -

13  the conversation is what the conversation is, but independent

14  of the conversation there's nothing to suggest that that

15  statement by Owens or attributed to Owens by a CW was true.

16        THE COURT:  Well, not just attributed--

17        MR. KRUPP:  The only--

18        THE COURT:  -- it was a recorded conversation.

19        MR. KRUPP:  Recorded, yes, right.  It's attributed in

20  this affidavit.  You obviously don't have quotations or

21  anything like this.

22        THE COURT:  Right.

23        MR. KRUPP:  But this is a rendition of that statement

24  attributed to Owens and there's nothing, as far as I believe,

25  or anything to suggest that that's true other than the

1  statement and, you know, it could just as equally be

2  susceptible to a different interpretation.

3        THE COURT:  As to that point, and I'll give you a

4  chance Mr. Richardson to respond, but my view of the evidence

5  is at this point as to that the evidence is simply that

6  statement basically.  There isn't - the government at least so

7  far has advanced no other evidence.  I have no idea whether

8  they have other evidence or not.  That's what they've advanced

9  in court and so that's what's before me.  So if you choose to

10  basically dispense, waive the probable cause hearing and

11  concede to probable cause, which is fine, in my view the only

12  evidence before me as to whether Mr. Owens owned, I'm sorry -

13  whether Mr. Owens sold the guns as opposed to, sold the guns to

14  Quirk and not merely held them the evidence would be just that

15  sentence because my recollection is there's nothing else in the

16  affidavit that speaks of that.

17        MR. KRUPP:  I think that's true.

18        THE COURT:  So that's the point you're making.

19  That's fair argument and--

20        MR. KRUPP:  Fine.

21        THE COURT:  Okay.  As to the other two points, I view

22  them somewhat similarly, Mr. Krupp, in that I don't see in the

23  complaint, in the affidavit in support of the complaint the

24  government hasn't put forth any evidence in the papers before

25  me suggesting that Mr. Owens was one of the individuals that

9

1    confronted the armored car.  You could remind me, either one

2    of you if my recollection is wrong, but that's my recollection

3    of the complaint affidavit.

4              MR. KRUPP:  That's fair, your Honor.

5              THE COURT:  And in light of that, I think I'd be

6    unlikely to infer that he was one of the people, at least based

7    on the state of the evidence in front of me today, I'd be

8    unlikely to infer that he was one of the individuals that the

9    guard, the armored car guard saw confronting him on the street.

10             MR. KRUPP:  That's fine.

11             THE COURT:  Okay.  So then I think it – what you want

12   to do is concede to probable cause, waive the preliminary

13   examination and proceed to argue it on the question of release

14   or detention.

15             MR. KRUPP:  Correct.

16             THE COURT:  Okay.  Mr. Owens, do you understand what

17   your lawyer has just proposed?  That is, let me just explain so

18   it's clear on the record.  What he's proposed, you have the

19   right to two things, the two issues that are being decided here

20   today.  First is probable cause, the probable cause to believe

21   a crime is committed and that you had some, probable cause to

22   believe that you committed it.  And second, the question of

23   release or detention.

24             As to the first question, what he proposes is that

25   you waive the probable cause hearing or preliminary examination

1   and concede that there is probable cause.  It doesn't mean

2   you're conceding to the crime or anything.  It simply means

3   you're not contesting the question of probable cause today ,and

4   then we'll proceed and we'll have an argument on release or

5   detention, and then I will decide whether you get released or

6   whether you're detained.  If you want to talk to Mr. Krupp some

7   more you can, but the question is, is that what you want to do,

8   waive the preliminary exam and just address or consider the

9   second question of detention or release?

10          MR. KRUPP:  May we have a moment?

11          THE COURT:  Yes.

12  (Pause)

13          MR. KRUPP:  Thank you, your Honor.

14          THE COURT:  Okay.

15          MR. KRUPP:  I just talked to Mr. Owens, and he is

16  prepared to go forward as I represented.

17          THE COURT:  Great.  Okay, then I will just give you

18  this form that memorializes that, and just you and he need to

19  sign it.

20  (Pause)

21          THE COURT:  Okay, Mr. Owens, you just signed that,

22  right?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  Okay.  Then I'll accept that waiver of a

25  preliminary examination and we can go right to the question of

11

1  release or detention.  I suppose though even though it's your

2  motion, Mr. Richardson, it might clarify the issues a little

3  bit if we start with you, Mr. Krupp, just to have you set forth

4  what sort of conditions you might like to propose and then we

5  can proceed from there.

6        MR. KRUPP:  That's fine, your Honor.  It's a little

7  putting the cart before the horse I think in terms of the

8  case.

9        THE COURT:  At least just set out the conditions.

10        MR. KRUPP:  Sure.  The conditions we would propose

11  would be home detention monitored electronically, and at least

12  initially 24-7 home detention.

13        THE COURT:  And that would be where?

14        MR. KRUPP:  At his mother's house--

15        THE COURT:  Okay.

16        MR. KRUPP:  -- who has been determined by pretrial to

17  be a suitable location and that has been determined to be a

18  suitable residential location, and in the third party

19  custodianship of his mother who is here and can be a part of,

20  your Honor.  In addition, his mother has upwards of $300,000 of

21  equity in her house and she's willing to post her house to

22  secure his release.

23        THE COURT:  Who lives there?

24        MR. KRUPP:  I beg your pardon?

25        THE COURT:  Who lives in the house?

12

1          MR. KRUPP:  Mr. Owens' mother and her husband who

2     has been Mr. Owens' de facto father for a long time.

3          THE COURT:  Okay.

4          MR. KRUPP:  With the conditions, Mr. Owens also

5     happens to be a very regular attendee at AA meetings, and I

6     think it makes sense for him to continue in that.  I don't know

7     how one works home confinement around AA, but I think there's

8     probably a way to do it and--

9          THE COURT:  Was he in the Silver House pursuant?  I

10    haven't read the pretrial services report yet, I'm going to do

11    that in a minute, but was he there pursuant to some sort of not

12    supervised release but parole--

13         MR. KRUPP:  No.

14         THE COURT:  -- or some--

15         MR. KRUPP:  No.

16         THE COURT:  Not under any supervision?

17         MR. KRUPP:  Correct.

18         THE COURT:  Okay.  All right.  Well, that's helpful

19    to clarify.  Mr. Richardson, I'll give you a minute, a moment

20    to argue.  I just want to take a look at this report so I

21    understand what the two of you are talking about.

22    (Pause)

23         THE COURT:  Mr. Krupp, are you proposing that the

24    house be posted simply to secure his appearance or to secure

25    his compliance with all released conditions?

13

1      MR. KRUPP:  Compliance with all of these conditions.

2      THE COURT:  Okay.  Does his mother--

3      MR. KRUPP:  And for that reason she's willing to

4  serve as a third party custodian.  I mean Mr. Owens--

5      THE COURT:  Does she work?

6      MR. KRUPP:  -- understands that he would have to

7  continue his sobriety and if he relapsed, it would be at some

8  jeopardy.  She'd be obligated to report him to the court.

9  Obviously, she would understand that as a third party

10  custodian, she'd have to call pretrial or what have you.  I

11  would expect significant drug treatment in any event or drug

12  testing would be part of any release conditions.  But she would

13  still have--

14      THE COURT:  Hasn't he been sober for the past 14

15  months?

16      MR. KRUPP:  Yes.

17      THE COURT:  Does she work?

18      MR. KRUPP:  Yes.

19      THE COURT:  Outside the home?

20      MR. KRUPP:  I believe so.  Oh, no?

21      THE COURT:  Oh.

22      MR. KRUPP:  May I have a moment?

23      THE COURT:  Sure.

24      MR. KRUPP:  I'm sorry.

25  (Pause)

14

1        MR. KRUPP:  I stand corrected from the back of the

2   courtroom.  No, Mr. Owens' mother is home.  She is not working

3   outside the home.

4        THE COURT:  Mr. Richardson?

5        MR. RICHARDSON:  Thank you, your Honor.  We've moved

6   that the defendant here be detained both based on the nature of

7   the crime with which he's charged and the risk of flight based

8   on the sanctions he's facing given the nature of the offense.

9   Then turning to danger first and to the crime itself, I think

10  it almost goes without saying that the crime of armored car

11  robbery is one of the most serious violent crimes that comes

12  before this court.  I mean, this case obviously it was an

13  attempt and a conspiracy but the attempt was made.  It was made

14  in broad daylight, put the guards themselves at severe risk of

15  harm to themselves or even death, and I think the Court can

16  take judicial notice of the fact that there have been several

17  instances of some notoriety just in this region in the

18  relatively recent past in which guards have been injured or,

19  and/or killed.  In addition to the guards, members of the

20  public obviously are placed at risk.

21        The evidence here shows that there was a plan to use

22  weapons, serious weapons, an AK-47 assault rifle, a Mac-11

23  firearm, bullet proof vests, handguns and other such weapons

24  and materials for use in armored car robberies.  The affidavit

25  in both this case and the companion case show that in fact one

15

1    of the armored car guards who was on the truck at the time of

2    the attempt saw an AK-47 that closely matches the description

3    given by the cooperating witness and closely matching what was

4    in fact recovered ultimately.  And again, as the Court knows

5    from the companion case, weapons, bullet proof vests and other

6    items for use in armored car robbery that were in exactly the

7    sort of bag described by the cooperating witness were in fact

8    recovered from the defendant's bedroom at

9    311 Pearl Street.

10           Now it's true that it's the government's theory and

11   in fact the government's belief that Mr. Owens was an aider and

12   abetter of this conspiracy in this attempt, that he was not

13   actually out on the street himself, that he was not actually

14   acting as one of the robbers on June 16th, but the evidence

15   clearly shows that aiding and abetting makes an aider, under

16   Section 2 it makes an aider and abetter just as guilty of the

17   underlying offense as is a principal, and I'd respectfully

18   submit that in a case such as this that's fully appropriate.

19           The defendant before the Court also has a somewhat

20   long history of convictions for violent offenses.  If you look

21   at his adult record beginning back in August of 1988, this

22   would be on page one of his prior record there appears to be a

23   conviction for assault and battery with a dangerous weapon from

24   Charlestown District Court.  Two months later another

25   conviction for assault and battery with a dangerous weapon out

16

1  of the same court.  Turning to the next page, an offense for

2  which the date is given as July of 1990, a third conviction for

3  assault and battery with a dangerous weapon, again out of the

4  Charlestown District Court.  And moving on through the 1990's,

5  in December of 1991 a conviction for armed robbery out of

6  Middlesex Superior Court.  In March of `92 another conviction

7  for armed robbery out of Middlesex Superior Court along with a

8  conviction for A&B DW.  In October of `94, a conviction for A&B

9  DW and another armed robbery, this time out of Suffolk Superior

10  Court.  And it's true the violent convictions appear to end at

11  around there, but they are nonetheless disturbing both in

12  their, the type of offense and in their frequency.

13        The bottom line is that based on these convictions

14  Mr. Owens appears to be both a career offender and an armed

15  career criminal.  He's not charged at this time with being a

16  felon in possession of a firearm, but I would suggest that

17  based on his record that is at least one offense that clearly

18  he could be charged with.

19        Turning to the guidelines in this case, the statutory

20  maximum for the Hobbs Act attempt/conspiracy is 20 years in

21  prison.  And based on the guidelines, which obviously don't

22  mean quite as much as they used to, but I think still mean

23  quite a bit especially in certain sessions of this court, the

24  low end of the guidelines range just for the Hobbs Act

25  violation on a plea would be 151 months.  There also is an

17

1   obvious potential for Mr. Owens to be charged with 924(c)

2   violations.  The Court's aware that in the companion case

3   Mr. Quirk was in fact charged with a 924(c) violation.

4           In a situation like this, the penalties both

5   statutory and guidelines can be significant.  There is no

6   maximum for a 924(c) violation as the Court knows.  There is a

7   maximum, it's life.  The firearms that were recovered haven't

8   been analyzed yet.  There simply hasn't been time, but if

9   either the AK-47 or the Mac-11 proves to be fully automatic

10  that's a minimum mandatory term of 30 years on and after any

11  other sentence that one of these defendants receives.

12  Similarly if that device that was attached, that is attached to

13  the Mac-11 proves to be a silencer and not as candidly

14  Mr. Owens told the CW a glass suppressor, but it proves to be a

15  silencer whether in name or in operation, again that's a

16  minimum mandatory statutory term of 30 years on and after

17  everything else.  Putting aside the mandatory minimums--

18          THE COURT:  Those are separate from the 924(c) times?

19          MR. RICHARDSON:  Those are 924(c)'s.

20          THE COURT:  Oh, those are the--

21          MR. RICHARDSON:  Right.

22          THE COURT:  Oh, I see?

23          MR. RICHARDSON:  Yes, it's--

24          THE COURT:  Right.

25          MR. RICHARDSON:  -- it's a separate minimum mandatory

18

1   under 924(c). I believe 30 years penalties are for fully

2   automatic machine guns, silencers. I think grenades are

3   included, but that's statutory under 924(c). I'm just turning

4   to the guidelines under 924(c), I'm not sure when exactly the

5   sentencing commission did this, I think it was some time around

6   2002--

7        THE COURT: I'm just going – there's going to be the

8   separate career offender--

9        MR. RICHARDSON: For the 924(c). And I know after

10  trial it's 360 to life, so again 30 years to life. There's

11  some reduction for a plea but it is still above the, what

12  ordinarily is the minimum mandatory of five or in this case I

13  think at least seven years given the firearms were brandished

14  during the robbery.

15        On top of that there is as pretrial services notes

16  the defendant's history of drug abuse. I note that it is

17  commendable that the defendant has made strides to attempt to

18  deal with that. There was one relapse I guess in the not too

19  distant past. He's recorded that he has been drug free I

20  believe it was for the last 14 months, but again there's a

21  concern that somebody who has that sort of history of drug

22  abuse and who does have something of a history of relapsing may

23  relapse and pose a danger on that basis.

24        The bottom line is that given the defendant's

25  participation which again was as an aider and abetter, but it

1   was as an aider and abetter in a particularly serious crime,

2   coupled with his own record for serious criminal activity, the

3   government believes that there's a serious risk of danger to

4   the community were he to be released.

5           Regarding risk of flight, it probably is fairly

6   obvious just based on what I've already said, but the defendant

7   here is facing very, very significant potential penalties if

8   he's convicted.  I mean, I've just gone through the penalties

9   for the Hobbs Act and the very significant penalties for a

10  924(c) violation.  If that's what he ends up getting charged

11  with, they are significantly greater I think than he has faced

12  given his experience with the state prison system and that sort

13  of a potential penalty hanging over one's head I think gives,

14  creates a significant risk of flight.

15          THE COURT:  Are there any applicable presumptions?

16          MR. RICHARDSON:  Your Honor, actually I think the

17  924, I think you've got probable cause notwithstanding that

18  it's not an offense in the affidavit, but there is case law.  I

19  wish I'd looked it up but there's some case law for the--

20          THE COURT:  Oh, I see, it's only if there were 924(c)

21  charged, if I found probable cause to 924(c), that would invoke

22  a presumption?

23          MR. RICHARDSON:  Yes.

24          THE COURT:  You're saying that even absent the

25  charge, I could find probable cause--

20

1          MR. RICHARDSON:  As you asked the question, yes,

2     exactly.

3          THE COURT:  Oh.

4          MR. RICHARDSON:  I--

5          THE COURT:  I'm not inclined to go there because you

6     haven't charged it and, so I'm not going to - other than a, so

7     that's what was in my mind, but I remember now, the other case

8     you did charge the 924(c).

9          MR. RICHARDSON:  Yes.

10         THE COURT:  Right.

11         MR. RICHARDSON:  Yes.

12         THE COURT:  And--

13         MR. RICHARDSON:  In the case of Dennis Quirk, that is

14    in the affidavit--

15         THE COURT:  Right.  Okay.

16         MR. RICHARDSON:  -- and it was before Judge Bowler as

17    which frankly was probably as much a function of how quickly we

18    are moving.  But you're right, it's not charged here--

19         THE COURT:  Okay.

20         MR. RICHARDSON:  -- on the face of the complaint.

21         THE COURT:  All right.

22         MR. RICHARDSON:  The one thing is if I could have a

23    moment--

24         THE COURT:  Yep.

25         MR. RICHARDSON:  -- there is the provision for a

21

1    presumption and it always takes me a couple of minutes to work

2    through it, but it's that one that applies if a defendant is

3    out on release--

4            THE COURT:  I know which one--

5            MR. RICHARDSON:  -- on another case and commits

6    either a violent crime or a drug offense, and it's within so

7    many years.  I don't think it would apply in this case because

8    Mr. Owens' violent crimes seem to be far enough in the past

9    though that I think it's outside that--

10           THE COURT:  Time.

11           MR. RICHARDSON:  -- reach back period, which I think

12   is five years but that--

13           THE COURT:  All right.

14           MR. RICHARDSON:  -- would be the one that potentially

15   applies.

16           THE COURT:  Okay.  Do you have anything else,

17   Mr. Krupp?

18           MR. KRUPP:  Yes, I do.  Let me talk a little bit

19   about the offenses.  Let me see if I can work backwards here

20   where Mr. Richardson left off.  Your Honor, points out that

21   Mr. Owens is charged with only the Hobbs Act violation or

22   aiding and abetting, the Hobbs Act violation.  He is not

23   charged with 924(c) and all the speculation about 924(c) I

24   think is respectfully that.

25           THE COURT:  I'm not invoking the presumption--

22

1          MR. KRUPP:  Okay.

2          THE COURT:  -- under 924(c).

3          MR. KRUPP:  So we're talking about Hobbs Act.  If

4    we're talking about Hobbs Act, we have 20-year maximum penalty,

5    and even if Mr. Owens is a career offender, he's looking at on

6    the low end 151.  It's approximately 12 and a half years.

7          The long history of convictions that Mr. Richardson

8    described are a long history of convictions involving conduct

9    that ended more than 10 years ago, and the most recent

10   conviction was in `94 for a conduct in `94.  Mr. Owens was

11   released from jail on that cluster of events because you'll

12   notice that a number of them were sentenced on the same day,

13   May 20th of 1992.  He was released on those in `97, and he was

14   released to a treatment program because he had a serious drug

15   addiction.  And it's odd to have two detention hearings before

16   your Honor in the same day involving serious drug addictions,

17   and I know your Honor sees a lot of them, but in this instance

18   there is a long history of treatment unlike the hearing you had

19   this morning.  And here you have a person who has taken

20   advantage of those opportunities for treatment.  You have a

21   person who was inpatient at Project Turnabout, the program to

22   which he was paroled from the state system and he took

23   advantage of that and was in the program for a long period -

24   let me just get the exact amount - 13 months the first time.

25   And then he was, he relapsed because, I mean, I think progress

23

1   is not always linear, and he goes back there on his own for

2   another eight months in order to finish the program.  It's not

3   something he was compelled to do.  It was something he chose to

4   do to go back.  And then after he graduated the program, he

5   continued to serve in a counseling capacity for them.  He

6   continued to get outpatient treatment himself in a program in

7   Quincy, but he continued to serve a function for the Project

8   Turnabout where he had been, and he started AA programs

9   himself.  He went to AA programs himself in Charlestown and

10  various other places, many other places, over the last seven or

11  eight years since finishing with Project Turnabout but he even

12  started meetings himself in Charlestown for kids who were

13  having problems with drugs.  Mr. Owens is a person who would go

14  to AA twice a day every day of the week.  That's been his

15  history over the recent six or seven years since he got out of

16  jail.

17        Now, again, it hasn't been linear.  He's had some

18  relapses in there, but he's always been able to go back to the

19  sober environment and the people who were trying to maintain

20  their sobriety in order to maintain his sobriety.  So in a very

21  real way he has turned his life around since the days when you

22  see those violent crimes on the record.

23        Now, I'd also note that I did not see on that record

24  any defaults.  He shows up for court.  Mr. Richardson argues

25  that Mr. Owens has never faced the kind of time he's facing on

24

1    this particular charge, and if we're talking about the Hobbs

2    Act aiding and abetting charge, he has faced those kinds of

3    serious charges on the state system, the armed robbery stuff.

4    I may have missed – maybe there's one default on the record.    I

5    don't want to overstate it, your Honor, but I think it's

6    important to recognize there's very few if any defaults on his

7    record.

8         With respect to the nature of the offense, the reason

9    I made the clarifications that I made at the beginning were

10   because I think it goes to the weight of the evidence against

11   Mr. Owens, which is a relevant factor for your Honor to

12   consider on the detention question.  And Mr. Owens is not

13   charged and the government has not made the allegation that he

14   was at the armored car.  The government says this is a crime of

15   armored car robbery and that's the most serious kind of violent

16   crime that one can engage in and that was done by anyone by

17   someone other than Mr. Owens.

18        The government says there was a plan to use weapons

19   and vests and all this other stuff.  That was somebody else's

20   plan.  That was not Mr. Owens.  The government says that they

21   believe that Mr. Owens was an aider and abetter not one of the

22   people that went to the robbery and that aiders and abetters

23   are the same, just the same, just as guilty.  And the law is

24   that, the law is that the penalty for aiding and abetting is

25   the same but the conduct is very different.  And the conduct

1   is, I would suggest, not conduct that suggests someone who

2   will go out and be a danger to the community.  The conduct is

3   different in kind than someone who goes out and does an armored

4   car robbery.

5           The government made the argument that there were

6   weapons found in the bag in Mr. Owens room at 311 Pearl Street.

7   Respectfully, your Honor, in the pretrial services, especially

8   because I had seen the criminal complaint that I knew there was

9   an allegation about something happening at 311 Pearl.  When

10  Mr. Owens was interviewed by pretrial services, it was on my

11  advice that he did not talk about other addresses that he's

12  maintained, but it is notable, your Honor, that 25 Admirals Way

13  where his mother lives is the address where he has always

14  gotten his mail.  He's always lived there.  He's kept clothes

15  there.  That's his permanent address and even when he has lived

16  from time to time at other places he has always gone back even

17  frequently during any particular week to stay with his mother.

18          With respect to the conditions of release that I was

19  proposing - I should do one other correction and that is

20  although his age is listed here as 32, he's actually 34.  The

21  date of birth may well be right but the calculation of what the

22  age is is incorrect in the pretrial services report.

23          But with respect to the release conditions that I was

24  proposing, and I want to put those release conditions as a

25  contrast to the assessment of flight and danger in the pretrial

26

1   services report, the pretrial services report says that Mr.

2   Owens' criminal record is concerning for pretrial. Well, of

3   course I understand that and I'm trying to put that into some

4   sort of context. They concede that the majority of felony

5   convictions happened some time ago, and they talk about Mr.

6   Owens' mother being willing to post her home as collateral and

7   the pretrial services office belittles that, if you will, by

8   saying that she's had little influence on Mr. Owens' drug use

9   and criminal behavior and she's likely to have even less

10  influence over him now. If you think about what she is

11  suggesting to the Court, that is to say she is willing to put

12  up her house and the equity that she and her husband have in

13  the house because they believe that Mr. Owens is not a risk of

14  flight, he's not going anywhere, and he's going to maintain his

15  sobriety, he's going to do whatever the Court instructs him to

16  do, he's going to check in with pretrial and what have you, I

17  think that speaks volumes about what she believes she is able

18  to control or that he, Mr. Owens, is able to control himself

19  and that he's internalized it and he's willing to control it.

20         The next part talks about Mr. Owens struggling with

21  his sobriety, okay, and that he is at greater risk when he

22  relapses. Well, he's the first one to concede that, that he

23  needs to maintain his sobriety and that he can't relapse. And

24  the pretrial conditions that we're proposing will take that

25  into account. If he relapses, his mother's going to report him

1   to pretrial or to your Honor or to whoever she's supposed to

2   report, and he will be in a very structured environment.  In

3   fact, he's going to be under home detention.  I hope that at

4   some point down the road we would come back to your Honor and

5   try to modify those conditions but right now I'm talking about

6   straight home confinement.

7         I think it makes sense for Mr. Owens continue to

8   receive the support of the AA meetings that he's attended in

9   the past.  And I'm suggesting there's a member of law

10   enforcement that attends these meetings and knows Mr. Owens

11   well from these meetings and I would suggest that he leave the

12   house only in, you know, with that person, let's say, so that

13   he can go to the AA meetings.  We can do it on the schedule so

14   that the electronic monitoring knows when he's going to be out

15   of the house and when he's going to be back so it can be

16   monitored.  But, you know, I can – it's only because of

17   confidentiality with AA that I would not offer that name--

18         THE COURT:  I know that.

19         MR. KRUPP:  -- in court but we could provide that to

20   your Honor.

21         Let me also say that Mr. Owens was not arrested on

22   this charge so-called.  He was arrested so-called, not charged

23   so-called.  He was summoned down to the police station.  He was

24   called by the police and asked if he could come down to the

25   Malden police station, which he did.  And it's true they didn't

28

1  say to him on the phone this is about the investigation for

2  any role you might have had as an aider and abetter in an

3  armored car robbery, but at the time there were helicopters

4  circling around over the place the government alleges the guns

5  were found and they allege that he used to live.

6         He knew what they were calling about, and he went

7  down to the police station, and it was there that he was placed

8  under arrest.  When he was there he was permitted by the Malden

9  police to see his mother who came down to the station to see

10 him, in the open area outside of the police station.  Her car

11 was parked right there.  He had not yet been - I actually don't

12 know if he had yet been placed under arrest or not when he was

13 allowed, no, had not yet been placed under arrest, but he was

14 allowed while he was at the Malden police station to speak with

15 his mother in that kind of environment even though he was down

16 there with the police, and he was allowed to make that call and

17 yet he stayed right there.  Okay.

18        There's every indication that he would not, that he

19 did not run then and would not run now, and that the conditions

20 of release that we're proposing would be more than sufficient

21 to assure that he would appear in court and would not pose a

22 danger to society.

23        THE COURT:  I have one question.

24        MR. KRUPP:  Yes?

25        THE COURT:  The house is owned by his mother or his

29

1    mother and his stepfather?

2            MR. KRUPP:  Jointly.

3            THE COURT:  Jointly.  So both of them are prepared

4    to--

5            MR. KRUPP:  Correct.

6            THE COURT:  Okay.  All right.  I don't think I have

7    any other questions via to you.  I'll have to think about it,

8    and I'll take the matter under advisement and you'll hear from

9    the clerk.

10   (Court adjourned)

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

30

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

Maryann V. Young

February, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                                    Crim. No. 05-mj-00029-LTS

JASON OWENS,
          Defendant.


MEMORANDUM AND ORDER

June 29, 2005

SOROKIN, M.J.

        Defendant Jason Owens has been charged in a criminal complaint with violations of 18

U.S.C. §§ 1951(a) (Hobbs Act robbery) and 2 (aiding and abetting).  At the Preliminary

Examination and Detention Hearing, Defendant, represented by counsel, waived his right to a

preliminary examination and, for purposes of the detention hearing, conceded that the complaint

established probable cause.  The Government moved for detention on the grounds of danger to

the community, 18 U.S.C. § 3142(f)(1)(a) & (d), and risk of flight, id. at 3142(f)(2)(a).  I allow

the Government's Motion and Order the defendant DETAINED as set forth below.

        The relevant facts are those set forth in the (1) criminal complaint, (2) the Pretrial

Services Report (except that Owens is 34 not 32 as listed on page 1), (3) the summary of Owens'

criminal record attached to the Report and (4) the oral report from Pretrial Services that Owens'

mother is a satisfactory person to serve as a third party custodian, a conclusion reached after a

Pretrial Services Officer interviewed her.  I do not intend to repeat in this Order each of these

facts, although I have reviewed all of the foregoing.

1

FINDINGS OF FACT AND CONCLUSIONS OF LAW

On or about June 16, 2005  three persons armed with, at least, an AK-47 attempted to rob an armored car in broad daylight in the North End of Boston.  Later that day, a search of the defendant's room at a sober house in Malden revealed an AK-47, other weapons, and at least one bullet proof vest. (Although these facts are not set forth in the items listed above, counsel referred to these facts and made arguments about them at the hearing; hence I am considering them for purposes of detention).  According to the evidence in the complaint, for at least the six weeks leading up to the attempted armed robbery, Owens had been holding these weapons for the robbers.  He had also agreed to allow the robbers to use the sober house as a rendezvous point after the robbery which, the evidence suggests they did on June 16th.

Clearly, Owens well understood the nature of the items he held for the robbers.  On April 27th he showed a confidential witness 2-3 bullet proof vests, an AK-47 and a MAC-11 carbine.  The nature of these items largely speak for themselves.   He also well understood the purpose to which the robbers intended to put these items – the commission of an armed robbery: the items taken together spoke this purpose; he told the CW that he was holding these items for the robbers; he was to be paid $2500 for holding the weapons from the robbery; he cleared out the other four residents of the sober house on April 27th, an earlier planned date for the robbery, so none of the other residents would be present when the robbers came and went; and he stated, in a recorded conversation with the CW, words to the effect that he not only held the guns for the robbers he had sold the guns to one of the robbers.

Owens is no stranger to armed offenses.  In 1992 he received a 6-10 year split sentence from the Middlesex Superior Court for Armed Robbery and Possession of a Sawed Off Shotgun.

2

He also has at least four convictions for Assault and Battery with a Dangerous Weapon one of which he appears to have committed after the 1992 conviction for armed robbery.

During the period of time described in the complaint, Owens was not abusing drugs or alcohol; he was sober. Owens proposes to be released to live with his mother, a former substance abuse counselor, and his step-father, a teacher in the public schools, on twenty-four hour electronic monitoring. In addition, he proposes that his mother and stepfather pledge their home, including their approximately three hundred thousand dollars in equity in the home, to secure his compliance with all release conditions.

The defendant may be detained only if the Government establishes, by clear and convincing evidence, that the defendant is a danger to the community or, by a preponderance of evidence, that he poses a risk of flight. 18 U.S.C. § 3142; United States v. Salerno, 481 U.S. 739 (1987); United States v. Patriarca, 948 F.2d 789 (1st Cir. 1991). Considering all of the evidence and defendant's proposed conditions, I find the Government has met its burden of proof as to detention based on danger by clear and convincing evidence. As of April 27, 2005, if not earlier, Owens had agreed to hold very dangerous firearms together with other items, e.g. bulletproof vests, so that others could use all of these items to commit a dangerous violent crime, the robbery of an armored car. He further agreed to allow the robbers to use his sober house as a rendezvous point after the planned robbery. Owens rendered his assistance to the robbers with knowledge of their intentions and with the expectation he would profit from the robbery. He engaged in this conduct for a substantial period of time during which time, notwithstanding earlier struggles with

3

substance abuse, he was sober.[1]  All of this came well after Owens had already served ten years

in jail for armed robbery.  Although defendant's proposed conditions weigh against the

Government, on this defendant's record and the facts of this case, I nonetheless find that the

Government has met its burden of proof as to danger.  Defendant has demonstrated an inability to

conform his conduct to the law.  No condition or combination of conditions in this case will

reasonably assure the safety of the community and any other person.  Therefore, I Order that the

defendant be DETAINED pending trial.

     As to risk of flight, however, I do not find that the Government has met its burden of

proof.  The defendant and his family are from this area.  The defendant has strong ties to his

mother; he visited her often and she came to court on his behalf.  Although the defendant has

defaults on his record, he has none in the past five years.  His mother and stepfather have offered

to pledge their home as security for the defendant's appearance.  In light of the defendant's

family ties, I find this condition would reasonably assure his appearance notwithstanding the

substantial jail sentence he faces if convicted.  Thus, I deny the Government's Motion for

Detention as to risk of flight.

ORDER OF DETENTION PENDING TRIAL

     In accordance with the foregoing memorandum, IT IS ORDERED:

     1. That Mr. Owens be committed to the custody of the Attorney General or his designated

representative, for confinement in a corrections facility separate, to the extent practicable, from

---

[1] The evidence before me suggests Owens' role was only that described in the text of this Memorandum and Order; nothing in the complaint suggests, nor did the Government argue, that Owens was going to actually commit the robbery of the armored car.  Nonetheless, his willingness, for profit, to help the robbers poses a danger to community.

persons awaiting or serving sentences or being held in custody pending appeal;

2. That Mr. Owens be afforded a reasonable opportunity for private consultation with counsel; and

3. That on order of a court of the United States or on request by an attorney for the Government, the person in charge of the corrections facility in which Mr. Owens is detained and confined shall deliver Mr. Owens to an authorized Deputy United States Marshal for the purpose of any appearance in connection with a court proceeding.

RIGHT OF APPEAL

THE PERSON OR PERSONS DETAINED BY THIS ORDER MAY FILE A MOTION FOR REVOCATION OR AMENDMENT OF THE ORDER PURSUANT TO 18 U.S.C. § 3145(b).