```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
```

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | CRIMINAL NO. 05-10183-MLW |
| ) | |
| **JASON OWENS** ) | |

**OPPOSITION OF THE UNITED STATES TO
DEFENDANT'S MOTION FOR REVOCATION OF DETENTION ORDER**

Defendant Jason Owens (the "defendant") has moved this Court for revocation of the order of detention (the "Order") requiring his detention pending the trial of this matter. For the reasons that follow, the government opposes the motion.

**PROCEDURAL BACKGROUND**

On June 17, 2005, a criminal complaint was filed charging the defendant with aiding and abetting an attempted Hobbs Act robbery of an armored car in Boston's North End. The defendant had his initial appearance before United States Magistrate Judge Leo T. Sorokin on that same day. A detention hearing was held on June 27, 2005. Magistrate Judge Sorokin issued the Order detaining the defendant on June 29, 2005. On August 11, 2004, a grand jury sitting in Boston, Massachusetts, returned an indictment charging the defendant with conspiracy to commit a Hobbs Act robbery of an armored car (18 U.S.C. § 1951) and being a felon in possession of firearms and ammunition (18 U.S.C. § 922(g)(1)).[1]

---

[1] Codefendants Dennis Quirk, Martin O'Brien, and Arthur Burgess were also charged with attempted Hobbs Act robbery,

**THE FACTS**

The following information was available to the Magistrate Judge in reaching his decision to detain the defendant.

**The Facts Underlying the Charge**

On April 26, 2005, a Cooperating Witness ("CW") told the FBI that he learned from the defendant that Dennis Quirk, Marty O'Brien, Arthur Burgess, and Brian Lacey intended to rob an armored car the morning of April 27, 2005. Owens showed CW a black Nike zip-up bag which contained two or three bullet-proof vests, a Chinese model AK-47 assault rifle, and a MAC-11, a carbine.  CW described the Chinese model AK-47 as an older model, brown in color, "wooden", with duct tape on the front of it.  CW stated that there were two magazines for the AK-47 which were duct-taped together.  CW described the MAC-11 as being "brand new."  CW stated that the MAC-11 had some type of a gray attachment which went on the barrel.  CW stated that the attachment looked like a silencer, but Owens told the CW that it was a flash suppressor.  CW observed one long magazine for the MAC-11.  Owens told the CW that the vests were Brian Lacey's.  CW believed that the defendant was holding this bag for the aforementioned persons.

CW further told the FBI that the defendant lived at 311

---

924(c) violation, and, as to Quirk and Burgess, being felons in possession of firearms.

Pearl Street, Second Floor, Malden, Massachusetts, which CW described as a "sober house."  CW stated that five persons, in addition to the defendant, lived at the sober home.  CW stated that, based upon conversations with the defendant, the individuals involved in the robbery were planning to go back to the defendant's house after the robbery.  CW learned that the defendant was to get twenty-five hundred dollars ($2500) from the crew after the robbery for holding the weapons.

CW told the FBI that on the morning of April 27, 2005, the defendant had everybody out of his apartment by 8:30 a.m.  At approximately 3:45 p.m. on April 27, 2005, CW met with the defendant back at 311 Pearl Street.  The defendant told CW that at approximately 9:00 a.m. that morning, Quirk called him, advising that he was "disgusted."  Quirk explained that the robbery was not going to happen because one of the participants had gotten cold feet.  Quirk apologized to the defendant because he owed the defendant twenty-five hundred dollars ($2500).

On May 3, 2005, CW had a recorded conversation with the defendant during which the defendant indicated that the robbery had been postponed and that it would take place at a later date.  Among other things, the defendant indicated that he had sold the guns to Quirk and not merely held them.  During this conversation CW inquired as to why the robbery had been postponed, and the defendant indicated that 'Marty' (referring to Marty O'Brien) had

gotten cold feet.

    In a conversation which the CW had with the defendant on May 18, 2005, CW told the defendant that the CW needed a favor from him.  CW stated to the defendant that he needed "a little something" for himself, referring to a handgun.  The defendant told the CW that he did not have one to sell him, but did not think it would be a problem to find one.  The defendant then made the comment that he recently sold his gun to someone for four hundred dollars.  CW told the FBI that the defendant was referring to the twenty-five automatic with which the defendant shot someone.

    Not long before June 16, 2005, CW recently asked the defendant how "D," referring to Dennis Quirk, was doing.  The defendant responded that he and Quirk had a argument a few days ago and were not speaking.  Owens was told by Quirk that he and his crew were set up and ready to pull a robbery when he noticed a black Lincoln Navigator with tinted windows driving in the area.  Quirk then noticed some type of a Chevy with tinted windows also in the area.  After observing these two vehicles, Quirk surveilled the area more closely and discovered several other vehicles with tinted windows which looked suspicious.  Quirk told Owens "they [the FBI] were going to ambush us.  If we did the job, they would have grabbed us.  We had to abort."

    At approximately 11:38 a.m. on Thursday June 16, 2005, a

Loomis Fargo armored car was making a delivery/pickup at the Citizens Bank on Hanover Street in the North End of Boston. There were three Loomis/Fargo employees: a driver, a messenger and a guard.  When the Loomis/Fargo vehicle arrived at the location, the messenger opened up back door and start unloading coins out of the armored vehicle.  At that time, the messenger heard a car revving its engine and heard tires screeching.  The messenger looked up to see a blue minivan which pulled up along side the armored vehicle.  The side door of the minivan vehicle opened and a person, wearing a mask, pointed what appeared to be an AK-47 and said "Get the fuck down."  The messenger ran to a nearby store and drew his weapon.  The messenger came out of the store and saw the minivan pulling away from the location, having not taken anything.  Witnesses in the vicinity of armored vehicle saw the minivan travel from Hanover Street to Parmenter Street. The vehicle was then seen to take a right onto Salem Street and then a left onto Cooper Street.  Masked individuals were seen exiting the minivan; one witness observed one of the individuals carrying a gun.  The individuals were then seen entering a red car.

At approximately noon, an Everett town employee saw a red Buick pull up and three white males jump out, all of them wearing headgear.  The three individuals then jumped in to a white van, leaving the red Buick there with the motor running in the middle

of the intersection of Tileston and Williams Street in Everett. The individuals were seen getting into a white van. He did not observe windows on the body of the truck.

Upon learning of the attempted armored car robbery, agents proceeded to the vicinity of the defendant's residence at 311 Pearl Street in Malden, which is where CW had told them Quirk, O'Brien, and Burgess planned to rendezvous after committing a robbery.  Upon arriving, Special Agent April Haddock observed a man wearing a dark hooded jacket, dark ball cap, and blue jeans standing outside of 311 Pearl Street looking around in all directions.  She recognized him to be Martin O'Brien.  After a few minutes, he entered 311 Pearl Street.  Shortly thereafter, someone wearing a white hat, white shirt, and shorts, was seen exiting the house.  A chase ensued involving FBI special agents and the Malden Police.  The individual was apprehended in a nearby MBTA station and was identified as Dennis Quirk.  He was found in possession of a knife and arrested by the Malden Police. A neighborhood canvass of the area in and around the 311 Pearl Street location was conducted.  This search disclosed a white Econoline van, bearing Massachusetts registration 6305FF, which was found approximately 4 blocks away from the Pearl Street residence.  NCIC records disclosed that this vehicle was stolen the previous day.

Subsequent to the attempted robbery, one of the Loomis Fargo

armored car guards was interviewed. He told a detective that he had been confronted by a masked individual brandishing an AK-47 assault rifle which had a light brown or tan wooden stock, and a large magazine. This guard is licensed to carry firearms in the state of Massachusetts, and is familiar with, and has fired, an AK-47.

A search of the defendant's residence later that day disclosed an AK-47, other weapons, and at least one bullet-proof vest.

**The Defendant's Criminal History**

The defendant appears to be both a career offender and an Armed Career Criminal ("ACC").

Specifically, the defendant has convictions for, among other offenses, assault and battery with a dangerous weapon, sustained in Charlestown District Court on September 17, 1990; armed robbery and possession of a sawed-off shotgun, sustained in Middlesex Superior Court on May 20, 1992; assault and battery with a dangerous weapon and armed robbery, also sustained in Middlesex Superior Court on May 20, 1992; and assault and battery with a dangerous weapon and armed robbery[2], sustained in Suffolk Superior Court on May 9, 1995.

---

[2] Technically, according to the Pretrial Services Report, the robbery charge was "filed."

**ARGUMENT**

The Magistrate Judge correctly concluded that the defendant is a sufficient danger to the community that no conditions of release would reasonably assure the safety of the community. The defendant has a criminal history replete with crimes of violence in general and armed robbery in particular. While the conduct resulting in the current charges features him as an aider and abettor rather than as a principal, the evidence is nonetheless strong and reveals the defendant willing to assist in the commission of a crime – the robbery of an armored car – that all too frequently results in serious bodily injury, or even death.

The defendant places significant emphasis on his efforts in recent years to remain sober. As is implicit in the Magistrate Judge's detention order, however, in the context of this case the defendant's efforts at sobriety are not particularly reassuring, given that, notwithstanding these efforts, he still participated over a period of several weeks[3] in a conspiracy to commit a serious, dangerous violent felony. As part of his role in the conspiracy, he held for a time the weapons and other equipment intended by Quirk and his cohorts for use in the robbery. The weapons included an AK-47 assault rifle. But rather than

---

[3]The government does agree with the defendant that the complaint affidavit does not show that the defendant held weapons continuously over several weeks, but the fact that he held them at all is disturbing enough.

8

disassociate himself with the endeavor, knowing the nature of the men with whom he was dealing and knowing the nature of the weapons they planned to bring to bear, the defendant remained a member of the conspiracy and ultimately agreed to let the robbers use his apartment as a rendezvous point. Indeed, the defendant's role here shows that the defendant actively exploited his efforts at sobriety by making his room in the sober house available to store the robbers' crime kit and as a post-robbery meeting place.

As the Magistrate Judge found, the defendant has demonstrated himself unable or unwilling to conform his conduct to the requirements of the law. Given his record and his participation in the instant offense, no conditions of release would adequately assure the safety of the community.

## CONCLUSION

For the foregoing reasons, this Court should deny the defendant's motion to revoke the Order.

                                    Respectfully submitted,

                                    MICHAEL J. SULLIVAN
                                    United States Attorney

                    By:   /s/ Robert E. Richardson
                          Robert E. Richardson
                          Assistant U.S. Attorney