UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO.  05-10183-MLW |
| | ) |
| DENNIS QUIRK, | ) |
| MARTIN O'BRIEN, | ) |
| ARTHUR BURGESS, | ) |
| JASON OWENS, and | ) |
| PATRICK LACEY | ) |

TRIAL MEMORANDUM OF THE UNITED STATES

The United States submits this memorandum in the above-captioned case, which is scheduled for trial on April 2, 2007.

I.    SUMMARY OF GOVERNMENT'S CASE

A.    Indictment

The Second Superseding Indictment in this case contains six charges.  Count One charges defendant Dennis Quirk ("Quirk"), defendant Martin O'Brien ("O'Brien"), defendant Arthur Burgess ("Burgess"), defendant Jason Owens ("Owens"), and defendant Patrick Lacey ("Lacey") with conspiracy to affect commerce by robbery, in violation of 18 U.S.C. §1951.  Count Two charges Quirk, O'Brien, Burgess, and Lacey with an attempt to affect commerce by robbery, again in violation of 18 U.S.C. §1951.  Count Three charges Quirk, O'Brien, and Burgess with using and carrying during and in relation to, and possessing in furtherance of, a crime of violence – the attempt charges in Count Two – three firearms: an AK-47, a Cobray 9mm pistol, and a Sig Sauer 9mm pistol.  Count Four charges the same three defendants with

using and carrying during and in relation to, and possessing in furtherance of, the same crime of violence, a machinegun – the Cobray 9mm pistol.  Count Five charges defendant Jason Owens with being a felon in possession of a firearms – those identified above – and ammunition, in violation of 18 U.S.C. §922(g)(1). Finally, Count Six charges Quirk and Burgess with being felons in possession of the same firearms and ammunition, again in violation of 18 U.S.C. §922(g)(1).

   B.   **Summary of Evidence**

   The government includes here an overall summary of what it expects its evidence at trial to be rather than an exhaustive rehearsal of its entire case.  The summary is based in part on the anticipated testimony of two participants in the offenses and a cooperating witness.

   In late April of 2005, Quirk, O'Brien, Burgess, and Lacey planned to rob an armored car in Charlestown, Massachusetts. They were going to use Owens's room at 311 Pearl Street in Malden as a safe house after committing the robbery.  They armed themselves with an AK-47 assault rifle, a handgun, and a MAC-10 or MAC-11 firearm.  They traveled to the area of the planned robbery in three vehicles.  Lacey became concerned when he saw a Massachusetts State Police vehicle and a Boston police officer in the area.  He alerted the others when the armored car arrived at the bank, but the others were out of position because they had

been circling the area.  They tried to get into position to rob the armored car at its next delivery point but failed in this attempt as well.  Afterwards Quirk was upset with O'Brien, whom he blamed for being out of position.

In April 2005, Owens told a witness named Adelino Duraes, who also lived at the time at 311 Pearl Street ("Duraes"), that Quirk, O'Brien, Burgess, and Brian Lacey intended to rob an armored car the morning of April 27, 2005. Owens showed Duraes a black Nike zip-up bag that contained two or three bullet-proof vests, a Chinese model AK-47 assault rifle and a MAC-11 carbine. Among other things, Owens told Duraes that he had agreed to let the robbers use his room at 311 Pearl Street as a rendezvous point after the robbery in return for a sum of money.  The FBI attempted to monitor activity at 311 Pearl Street that day but later learned that Quirk had contacted Owens that morning to say, among other things, that he was "disgusted" but that the robbery was not going to occurred because one of the participants had gotten cold feet.

On May 3, 2005, Duraes, with FBI oversight, recorded a conversation with Owens.  During this conversation, among other things, Owens indicated that the robbery had been postponed but that it would take place at a later date.  When Duraes inquired as to why the robbery had been postponed, Owens indicated that "Marty," referring to O'Brien, had gotten "spooked."

3

Approximately a week after the initial effort, Quirk, O'Brien, Burgess, and Lacey decided to make another attempt to rob the armored car in Charlestown. Lacey and O'Brien stole two vehicles to use in this robbery attempt. The participants again set up in the area of the planned robbery, but this time decided to call it off because they saw a black Lincoln Navigator, which they believed contained federal agents, in the area. In fact, on May 11, 2005 federal agents were conducting surveillance in Charlestown, including in a black Lincoln Navigator.

In May 2005 Quirk became concerned that there was a GPS device on his Chevrolet Avalanche. He dumped it in the Boston Harbor in the presence of Lacey. On February 19, 2007, the FBI recovered the Avalanche from the water.

Approximately a week before June 16, 2005, Quirk and O'Brien picked up Owens on Main Street in Charlestown. They drove down Union Street, parked next to a skating rink, and they all got out of the vehicle. O'Brien walked away, and Quirk discussed with Owens Quirk's intention to commit an armored car robbery with Burgess and O'Brien on the following Thursday, June 16, 2005, outside of Charlestown. Owens agreed to let them use his apartment after the robbery as a rendezvous point in return for $10,000 to $15,000, but he declined to let them store the guns in his apartment before the robbery.

Quirk, O'Brien, and Burgess, as well as Lacey, had decided

4

to rob an armored car on June 16, 2005 as it made a stop on
Hanover Street in the North End.  They previously had stolen
three vehicles for use in the robbery and had left one of them, a
white van, in Everett.  Quirk, O'Brien, and Burgess were in a
blue minivan.  Quirk had a MAC-11 firearm, Burgess an AK-47, and
O'Brien a handgun.  Lacey was ahead of the minivan in a red
Buick.  They were in contact via cell phones and circled the
block approximately ten times before the armored car arrived.
Lacey ended up ahead as the minivan pulled up near the armored
car.

     There were three Loomis/Fargo employees: a driver, a
messenger, and a guard. When the Loomis/Fargo vehicle arrived at
the location, the messenger opened up the back door and started
unloading coin out of the armored vehicle.  The messenger heard a
car revving its engine and heard tires screeching and looked up
to see a blue minivan which pulled up along side the armored
vehicle.  The side door of the minivan vehicle opened and a
person, wearing a mask, pointed what appeared to be an AK-47 and
said "Get the fuck down."  The guard got down and the messenger
ran to a nearby store and drew his weapon.

     Meanwhile, O'Brien, concerned that the messenger was trying
to circle around to ambush them, began driving, pinning Burgess
against a vehicle in the process.  Burgess got back into the
minivan and they all drove off down Hanover without having

5

obtained any money.  Lacey saw them coming and led them in the
Buick over to Cooper Street, where they abandoned the minivan.
They all traveled in the Buick to Everett, where they abandoned
the Buick and, with O'Brien driving, all drove in the white van
that they had waiting there to 311 Pearl Street.  During one of
the car switches O'Brien lost a neoprene mask he had been
wearing.  O'Brien dropped the others off at 311 Pearl Street and
went to park the white van several streets away.

Meanwhile, when the FBI learned of the robbery attempt,
Special Agents ("SA") April Haddock and Tamara Harty, together
with Detective Lawrence McGahey of the Malden Police Department,
who served on the Bank Robbery Task Force, drove to the area of
311 Pearl Street.  As they were driving down Pearl Street in a
gold Ford Taurus, SA Haddock saw O'Brien, ultimately seeing him
enter 311 Pearl Street.  Not long thereafter she saw somebody
dressed differently from the way in which O'Brien had been
dressed leaving 311 Pearl Street. Members of the Malden Police
Department who were also present began following this individual,
who ended up at the nearby MBTA station.  In light of the nature
of the robbery attempt, SA Haddock, SA Harty, and Detective
McGahey went to assist the Malden police officials.  The person
who had left 311 Pearl Street proved to be Quirk, and he was
arrested for unlawful possession of a knife.

O'Brien, Lacey, and Burgess left 311 Pearl Street not long

after Quirk had done so.  O'Brien initially held them up as they were leaving because he said he saw a gold Ford Taurus that he had seen earlier when he was walking back from parking the white van.  After the Taurus had gone by, the three left 311 Pearl Street, walked down Pearl Street, and hailed a cab.  Burgess got out of the cab near a Home Depot in Somerville.  O'Brien and Lacey took the cab to a location in Charlestown, and then got Lacey's aunt's car and began driving to South Boston.

The FBI and other authorities, meanwhile, were concerned that O'Brien and perhaps others might still be inside 311 Pearl Street.  A member of the Massachusetts State Police assisting in this regard contacted O'Brien on his cell phone at around 2:35 p.m., saying he was at 311 Pearl Street and asking O'Brien to come outside to speak with them.  O'Brien said he did not know what the trooper was talking about, declined to give his location, and referred the trooper to his lawyer.  O'Brien then discussed with Lacey his confusion over the address, as they referred to the location of Owens's residence as Oakland Street, which runs along one side of the building, rather than Pearl Street.

When the FBI performed a security sweep later that day, nobody was present inside 311 Pearl Street.  When the FBI searched 311 Pearl Street pursuant to a search warrant, searching agents recovered, among other things, a black Nike bag containing

an AK-47 assault rifle; a Cobray 9mm carbine (commonly referred to as a "MAC-11"); a 9mm Sig Sauer pistol; ammunition; two bullet proof vests; clothing, including gloves and baseball caps; and other items.

As indicated previously, Quirk, O'Brien, Burgess, and Lacey were in communication via cell phone the day of the June 16th robbery attempt. Cell phone records for O'Brien's phone show, among other things, that his cell phone was "hitting off" a cell tower on North Street in Boston at around the time of, and before, the robbery attempt; that it "hit off" a cell tower in Malden at around 11:49 p.m.; that it "hit off" a cell tower in Malden a few times beginning at 11:56 a.m.

A black neoprene mask was recovered from the site where the robbers abandoned the Buick in Everett. Subsequent testing showed O'Brien to be the major contributor of DNA obtained from the mask. A Patriots hat was recovered from the scene of the robbery attempt. Subsequent testing showed Burgess to be the major contributor of DNA obtained from the hat. Burgess also proved to be the source of DNA obtained from one of the gloves found in the black Nike bag recovered from 311 Pearl Street, and the major contributor of DNA obtained from another glove. A baseball cap was recovered from the black Nike bag. Subsequent testing showed Quirk to be the source of the DNA obtained from the baseball cap.

Each of the three firearms recovered from the black Nike bag was successfully test-fired.  The Cobray 9mm proved to fire more than one round with a single pull of the trigger and thus qualifies as a machinegun.  Each of the firearms was manufactured outside of Massachusetts, as was all of the ammunition recovered.

Both Quirk and Burgess had sustained felony convictions prior to 2005.

## II.  SIGNIFICANT LEGAL ISSUES

The government perceives by far the most significant legal issue in this case to be whether the government must prove to the jury beyond a reasonable doubt for purposes of 18 U.S.C. §924(c)(1)(A) and 924(c)(1)(B)(ii) that the Cobray firearm was a machinegun and that a particular defendant knew it to be a machinegun, or whether instead the government need prove only that a particular defendant knew the Cobray was a firearm and its character as a machinegun is a matter solely for sentencing. While the government believes the latter to be the case, it sets forth below both the basis for that position and the limited authority to the contrary that it has located.

In Count Four of the Second Superseding Indictment, the government charges Quirk, O'Brien, and Burgess with using and carrying during and in relation to a crime of violence, and/or possession in furtherance of a crime of violence, a machinegun, in violation of 18 U.S.C. §924(c)(1)(A).  The crime of violence

9

is the attempted Hobbs Act robbery charged in Count Two of the Indictment.  Count Four is identical to Count Three, which charges the same crime with respect to three specified firearms, one of which is the same machinegun charged in Count Four. Conviction under Count Three, upon a finding by the Court at sentencing that one or more of the weapons was "brandished," would require imposition of a mandatory minimum sentence of seven years.  18 U.S.C. §924(c)(1)(A)(ii).  Conviction under Count Four would require imposition of a mandatory minimum sentence of 30 years.  18 U.S.C. §924(c)(1)(B)(ii).  Any sentence imposed upon a conviction under §924(c) requires that the sentence be imposed to run consecutively to any other term of imprisonment, including any term imposed for the underlying crime of violence.  18 U.S.C. §924(c)(1)(D)(ii).

The government has charged two violations of §924(c) because of a split in the circuits, discussed below, as to whether the "type of firearm" for purposes of §924(c) is an element of the crime itself, or a sentencing factor.[1]  The government is not attempting to obtain separate consecutive terms of imprisonment

_____

[1]A machinegun is not the only type of firearm that affects a sentence upon a conviction for a violation of §924(c)(1)(A).  If a firearm possessed is a "short-barreled rifle, [or] a short-barreled shot-gun," the required minimum consecutive sentence is 10 years.  18 U.S.C. §924(c)(1)(B)(i).  The same provision that provides for a 30 year sentence for a machinegun, also provides for a 30-year sentence if the firearm possessed is a destructive device, or is equipped with a firearm silencer or firearm muffler.  18 U.S.C. §924(c)(1)(B)(ii).

on Counts Three and Four.  Rather, it has charged the machinegun
separately in order to protect any conviction obtained for
using/carrying/possessing a machinegun from appellate reversal in
the event that either the First Circuit or the Supreme Court
later determines that the type of firearm is an element of a
§924(c) crime and must be pled in the indictment and found by the
jury beyond a reasonable doubt.  *See* <u>Hamling v. United States</u>,
418 U.S. 87, 117 (1974) (indictment of a grand jury must allege
all elements of the charged crime); <u>In re Winship</u>, 397 U.S. 358,
364 (1970) (government must prove each element of a crime beyond
a reasonable doubt); *see also* <u>Harris v. United States</u>, 536 U.S.
545, 549 (2002) (although sentencing factors may have a
substantial impact on a sentence, they are not elements, and are
not subject to the Constitution's indictment, jury, and proof
requirement).

### A.    Element Versus Sentencing Factor

Determining whether the type of firearm is an element of a
§924(c) crime or merely a sentencing factor is an issue that was
once conclusively settled by the Supreme Court, but has now been
reexamined by lower courts because of a Congressional amendment
that changed the structure of the statute.

In <u>Castillo v. United States</u>, 530 U.S. 120 (2000), the
Supreme Court construed a pre-1998 version of §924(c) and
concluded in a near unanimous opinion that the statute "uses the

word 'machinegun' (and similar words) to state an element of a
separate offense."  In so doing, the Court resolved a split in
the circuits that included the First Circuit's holding that the
type of weapon is not an element of a §924(c) offense.  *See*
United States v. Shea, 150 F.3d 44, 51 (1st Cir. 1998).

    The statute construed by Castillo read in pertinent part:

> Whoever, during and in relation to any crime
> of violence . . ., uses or carries a firearm,
> shall, in addition to the punishment provided
> for such crime of violence . . ., be
> sentenced to imprisonment for five years, and
> if the firearm is a short-barreled rifle [or
> a] short barreled shotgun to imprisonment for
> ten years, and if the firearm is a
> machinegun, or a destructive device, or is
> equipped with a firearm silencer or firearm
> muffler, to imprisonment for thirty years.

18 U.S.C. §924(c)(1) (1988 ed., Supp. V); Castillo, 530 U.S.
at 122.  The Supreme Court relied in large part on the structure
of the statute, with the element of using or carrying a firearm
and the word "machinegun" in "a single sentence, not broken up
with dashes or separated into subsections." Castillo, 530 U.S.
at 125.  The Court also noted that the following three sentences
refer directly to sentencing issues such as recidivism,
concurrent sentences and parole.  Id.  The Supreme Court
concluded: "These structural features strongly suggest that the
basic job of the entire first sentence is the definition of
crimes and the role of the remaining three is the description of
factors (such as recidivism) that ordinarily pertain only to

12

sentencing." Id.

In 1998, Congress reenacted §924(c)(1), separating different parts of the first sentence (and others) into different subsections.[2] Pub. L. 105-386, §1(a)(1), 112 Stat. 3469.  In pertinent part, Congress changed the statute to read as follows:[3]

> (A) [Whoever] during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall in addition to the punishment provided for such crime of violence or drug trafficking crime - -
>
> > (i) be sentenced to a term of imprisonment of not less than 5 years;
> >
> > (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
> >
> > (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.
>
> (B) If the firearm is possessed by a person convicted of a violation of this subsection --
>
> > (i) is a short-barreled rifle, shore-barreled shotgun, or semiautomatic assault weapon, the person shall be sentenced to a term of imprisonment of not less than 10 years; or

---

[2] A second and crucial change given later developments in Supreme Court jurisprudence, the 1998 amendments also changed the sentences provided for in §924(c) from fixed mandatory sentences to minimum mandatory sentences, such as "not less than ____ years."

[3] Congress has twice amended §924(c) since 1998, but has not changed the portion of the sentence relevant to the element/sentencing factor issue.  See Pub. L. 107-273, 116 Stat. 1809; Pub. L. 109-92, 119 Stat. 2100, 2102.

> (ii) is a machinegun or a destructive device,
> or is equipped with a firearm silencer or
> firearm muffler, the person shall be
> sentenced to a term of imprisonment of not
> less than 30 years.

Although the Supreme Court has not yet considered whether the "type of weapon" is an element or a sentencing factor in the amended version of §924(c), it has determined that "brandishing" a firearm, which increases the mandatory minimum from five years to seven years, is a sentencing factor and not an element. Harris v. United States, 536 U.S. 545 (2002). In holding that brandishing is a sentencing factor under §924(c)(1), the Supreme Court relied heavily on the new structure of the statute, which, in contrast to the earlier version construed in Castillo, separated the basic crime of using/carrying/possessing a firearm from various factors that affected punishment.[4] The Court concluded: "When a statute has this sort of structure, we can presume that its principal paragraph defines a single crime and its subsections identify sentencing factors."[5] Harris, 536 U.S.

―――――――――

[4]The argument is even stronger in this case than in Harris that type of weapon is a sentencing factor. In Harris, the sentence was imposed under §924(c)(1)(A). Here, the applicable provision is in §924(c)(1)(B) which is only applicable "[i]f the firearm is possessed by a person convicted of a violation of this subsection." The subsection B language conclusively divides the elements of the crime from sentencing factors by limiting application of the type of weapon enhancements to those persons already convicted of a crime under §924(c).

[5]The holding that brandishing was a sentencing factor was joined in by five justices of the Court. However, only four justices agreed that Apprendi does not apply to minimum mandatory

at 553.

Courts are nearly unanimous in §924(c) cases involving the post-1998 version of §924(c) that conduct and type-of-weapon facts are sentencing factors, and not elements of separate crimes. *See e.g.*, <u>United States v. Carlson</u>, 217 F.3d 986, 989 (8th Cir. 2000) ("§924(c)(1)(A) defines a single criminal offense for using or carrying a firearm during a violent crime, with sentencing implications if the firearm is brandished"); <u>United States v. Pounds</u>, 230 F.3d 1317, 1319 (11th Cir. 2000) (*per curiam*) ("language and structure of §924(c)(1)(A) demonstrate that Congress intended the fact of the discharge of a firearm during a crime of violence to be a sentencing factor and not an element of the §924(c)(1)(A) offense"); <u>United States v. Sandoval</u>, 241 F.3d 549, 550 (7th Cir. 2001) (holding that type of weapon in §924(c) is a sentencing factor); <u>United States v. Barton</u>, 257 F.3d 433, 442-43 (5th Cir. 2001) (rejected argument under plain error review that discharging a firearm was an element of a §924(c)(1)(A) offense).[6]

_____

sentences.  Justice Breyer concurred in the judgment of the Court because he believed "that extending <u>Apprendi</u> to mandatory minimums would have adverse practical, as well as legal, consequences," but did not join in the Court's opinion that <u>Apprendi</u> does not apply to mandatory minimums. <u>Harris</u>, 536 U.S. at 569-570 (Breyer, J., concurring in judgment)

  [6]<u>Pounds</u>, <u>Sandoval</u>, and <u>Barton</u> were all decided after the Supreme Court's decision in <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), and rejected arguments that <u>Apprendi</u> required that such factors as brandishing or type of weapon be submitted to and

The government has found only the Sixth Circuit to have found the type of weapon characteristic to be an element of a §924(c) charge. <u>United States v. Harris</u>, 397 F.3d 404 (6th Cir. 2005). In <u>Harris</u>, the defendant was sentenced under §924(c) to serve a consecutive 10-year sentence because the offense involved the use of a semi-automatic assault weapon. The type of weapon was neither charged in the indictment nor found by the jury. The Sixth Circuit distinguished the Supreme Court's decision in <u>Harris</u>, which had dealt with brandishing a firearm as opposed to the type of weapon used, considered the effect of the Supreme Court's post-<u>Harris</u> decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), and held that the type of weapon is an element of a §924(c) crime and must be pled and found by a jury. <u>Harris</u>, 397 F.3d at 413.

The government does not agree with the Sixth Circuit's decision in <u>Harris</u>, but has added Count Four to the indictment to protect against an adverse change in the law. If <u>Harris</u> is correct that the type of weapon is an element of a §924(c) crime,

---

decided by a jury. <u>Pounds</u> and <u>Sandoval</u> distinguished <u>Apprendi</u> on the obvious basis that the maximum sentence under 18 U.S.C. §924(c)(1) was life imprisonment, and judicial findings regarding mandatory minimums did not cause a sentence to be imposed in excess of the statutorily prescribed maximum punishment. <u>Pounds</u>, 230 F.3d at 1319; <u>Sandoval</u>, 241 F.3d at 551. <u>Barton</u> rejected the argument on the basis that <u>Apprendi</u> expressly limited its holding so as not to overrule <u>McMillan v. Pennsylvania</u>, 477 U.S. 79 (1986). *See also* <u>Harris</u>, 536 U.S. at 556-568 (plurality opinion) (reaffirming <u>McMillan</u> in light of <u>Apprendi</u>).

the use of a stand-alone machinegun charge will ensure that the jury considers and specifically decides both the type of weapon, and whether the machinegun, as opposed to any one of three weapons, was used/carried/possessed by a particular defendant. However, even if Harris does not become the prevailing view in this circuit, the government has no quarrel with the jury specifically determining whether a machinegun was used/carried/possessed by any particular defendant.

### B.    *Mens Rea* Requirement

The sentencing factor verus element issue has an important ramification concerning the *mens rea* required to prove a violation of §924(c) involving a machinegun.  If the type of weapon is a sentencing factor, then the jury must merely find knowing use/carrying/possession of a firearm, during and in relation to, or in furtherance of a crime of violence.  If that is the case, it would not be necessary for the government's evidence to show, or the jury to find, that a particular defendant knew the firearm was a machinegun.  It would be sufficient to show, and the jury to find, that a defendant knew he was possessing a firearm.  Numerous cases have so held.

The earliest case found by the government is United States v. Harris, 959 F.2d 246 (D.C. Cir. 1992).  In Harris, the defendants were convicted of violating §924(c) by trading drugs for a machinegun.  The instructions allowed the jury to convict

17

if it found that the defendants knowingly possessed a weapon and
the weapon was in fact a machinegun.  The defendants' request
that the jury be instructed that it had to find that the
defendants knew that the weapon would fire automatically was not
given.  The Harris court rejected a specific *mens rea* as to the
type of weapon involved, finding it only necessary that the jury
find the defendants to have knowingly and intentionally possessed
a firearm, and that they did so intentionally to facilitate a
drug trafficking crime.  Id. at 313.  Essentially, the court
found that a guilty *mens rea* existed based on the essential
elements of the crime (drug trafficking and use of a firearm),
and no additional *mens rea* was needed for one who committed the
crime with a machinegun.

   After Harris, the Eleventh Circuit came to the same result
in Brantley v. United States, 68 F.3d 1283 (11th Cir. 1995).  The
defendants in Brantley were convicted under §924(c) and sentenced
to 30-year sentences because the firearm was a machinegun.  Not
only was the jury not instructed that the defendants had to be
aware that the weapon had been altered to fire automatically, but
also there was no evidence to support such a finding at trial
because the modifications to the weapon were not apparent from
its outward appearance.  Id. at 1289.  The defendants argued that
the Supreme Court's then-recent decision in Staples v. United
States, 511 U.S. 600 (1994), required the government to show

18

knowledge of the character of the weapon to support an enhanced sentence under §924(c).[7]  The <u>Brantley</u> court distinguished <u>Staples</u> as having been concerned with imposing punishment on an innocent actor by contrasting it with a defendant's mental state who has been found guilty under §924(c).  <u>Brantley</u>, 68 F.3d at 1290.  The court stated: "the §924(c) defendant whose sentence is enhanced based on the type of weapon he carried has demonstrated a 'vicious will' by committing the principal offense." <u>Id</u>.  The court went on to hold: "although the enhancements in §924(c) are weapon-specific, the *mens rea* showing required by the statute is not." <u>Id</u>.

The First Circuit was the next to weigh in on this issue in <u>United States v. Shea</u>, 150 F.3d 44 (1st Cir. 1998) *overruled by* <u>Castillo v. United States</u>, 530 U.S. 120 (2000).  In <u>Shea</u>, the court construed the pre-1998 version of §924(c) and held that "the assault weapon provision is not an element of the §924(c) offense, but instead, a sentencing enhancement." <u>Shea</u>, 150 F.3d at 51.  The Supreme Court held to the contrary in <u>Castillo</u>. However, <u>Shea</u> is instructive here because, although the court's ruling on the element/sentencing factor issue was in error under the old statute, the court went on to hold that, as a sentencing

---

[7]In <u>Staples</u>, the Supreme Court held that in a prosecution for possession of an unregistered automatic firearm under 26 U.S.C. §5861(d), the government must prove that the defendant knew that the firearm possessed characteristics bringing it within the scope of the statute.

factor, it was not necessary for the government to prove that the
defendant knew the features of his firearm that made it a semi-
automatic assault weapon. <u>Id</u>. at 52. Thus, <u>Shea</u> can still be
said to stand for the proposition that specific knowledge of a
sentencing factor, where the *mens rea* of the principal offense
has been charged and proven, is not required.

In <u>United States v. Nava-Sotelo</u>, 354 F.3d 1202, 1205 (10th
Cir. 1999), the defendant challenged his 10-year sentence under
§924(c) that was enhanced by the trial court for the discharge of
a firearm and argued that a *mens rea* requirement must be read
into the brandishing and discharge provisions of §924(c). The
Tenth Circuit relied on the Supreme Court's holding in <u>Harris</u>,
536 U.S. at 556, that brandishing and discharge are sentencing
factors to be found by the judge, and concluded as a result that
no specific *mens rea* is required. <u>Nava-Sotelo</u>, 354 F.3d at 1206.

The Eighth Circuit appears to have been the last court of
appeals to deal with the *mens rea* issue under §924(c). In <u>United
States v. Gamboa</u>, 439 F.3d 796, 810 (8th Cir. 2006), the trial
court determined at sentencing that a particular firearm
possessed in connection with a §924(c) conviction was a
machinegun and imposed a 30-year sentence. The defendant argued,
citing <u>Castillo</u> and <u>Apprendi</u>, that because a judge and not a jury
determined his firearm was a machinegun, his constitutional
rights were violated. The <u>Gamboa</u> court rejected the <u>Castillo</u>

challenge as follows: "We agree with other circuits that have
concluded that §924(c)(1) is best construed as a single crime
with a choice of penalty options all within the overarching
statutory maximum life sentence." Gamboa, 439 F.3d at 811.  The
court rejected the Apprendi challenge "because §924(c) does not
permit a judge to impose a sentence that is above the relevant
statutory maximum." Id.  Finally, the court addressed the *mens
rea* issue and held: "Because the facts concerning the type of
firearm used in §924(c)(1) are sentencing factors, and not
elements of the offense, we also conclude that the United States
was not required to show that Gamboa subjectively knew that the
firearm was a machinegun." Id. at 812. *See also* United States
v. Morrow, 2005 WL 3163804 (D.D.C. 2005) (government need not
establish that defendants knew the precise nature of the weapons
knowingly used or carried during and in relation to the charged
crimes of violence).

Thus, the great weight of authority supports those courts
that have concluded that conduct (*i.e.* brandishing and
discharging) and types of weapons involved in §924(c) offenses
are sentencing factors, and not elements of separate crimes.  It
follows readily from that conclusion that the government need not
prove that a defendant knew that the firearm charged in Count
Four of the indictment was a machinegun.  The government has
submitted appropriate jury instructions consistent with the

positions it has taken herein.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/Robert E. Richardson
TIMOTHY Q. FEELEY
ROBERT E. RICHARDSON
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I, Robert E. Richardson, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 2, 2007.

/s/Robert E. Richardson

ROBERT E. RICHARDSON

22