1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                          No. 1:05-cr-10183-MLW

4

5
   UNITED STATES OF AMERICA
6

7   vs.

8
   JASON OWENS and PATRICK LACEY
9

10
                    *********
11

12
                  For Hearing Before:
13               Chief Judge Mark L. Wolf

14

15               Sentencing Hearing

16

17               United States District Court
                 District of Massachusetts (Boston.)
18               One Courthouse Way
                 Boston, Massachusetts 02210
19               Monday, May 5, 2008

20

21                    ********

22
               REPORTER: RICHARD H. ROMANOW, RPR
23                  Official Court Reporter
                 United States District Court
24      One Courthouse Way, Room 5200, Boston, MA 02210
               Email: bulldog@richromanow.com
25

```
1                    A P P E A R A N C E S

2

3    ROBERT E. RICHARDSON, ESQ.
        United States Attorney's Office
4        John Joseph Moakley Federal Courthouse
        1 Courthouse Way, Suite 9200
5        Boston, Massachusetts 02210
        (617) 748-3951
6        Email: Robert.richardson@usdoj.gov
        For the United States of America
7

8
     PETER B. KRUPP, ESQ.
9        Lurie and Krupp, LLP
        One McKinley Square
10       Boston, Massachusetts 02109
        (617) 367-1970
11       Email: Pkrupp@luriekrupp.com
        For Jason Owens
12

13
     ROBERT L. SHEKETOFF, ESQ.
14       Law Office of Robert L. Sheketoff
        One McKinley Square
15       Boston, Massachusetts 02109
        (617) 367-3449
16       Email: Sheketoff@aol.com
        For Patrick Lacey
17

18

19

20

21

22

23

24

25
```

1                P R O C E E D I N G S

2           (Begins, 2:45 p.m.)

3           THE CLERK:  Criminal Matter 05-10183, the

4    United States versus Jason Owens and Patrick Lacey.  The

5    Court is in session.  You may be seated.

6           THE COURT:  Good afternoon.  Would counsel

7    please identify themselves for the record.

8           MR. RICHARDSON:  Good afternoon, your Honor.

9    Robert Richardson for the United States.

10           MR. KRUPP:  Good afternoon, Judge.  Peter

11    Krupp for Jason Owens.  He's here with me at counsel

12    table.

13           MR. SHEKETOFF:  Good afternoon, your Honor.

14    Robert Sheketoff with Patrick Lacey, who is also with me

15    at counsel table.

16           THE COURT:  We're here today for the

17    defendants' sentencings.

18        In connection with -- well, let me ask you the

19    following.  Mr. Richardson, are there any victims

20    present who would like to make a statement?

21           MR. RICHARDSON:  No, your Honor.

22           THE COURT:  In connection with this

23    proceeding, I have the presentence report concerning

24    Mr. Owens with a number of objections.  The plea

25    agreement is attached to it.  I have 21 letters on

 1    behalf of Mr. Owens.  I have the government's sealed

 2    5(k)(1.1) motion.  And I have Pretrial Services' release

 3    status letter.

 4        Is there anything else I should have received and

 5    read concerning Mr. Owens?

 6            MR. RICHARDSON:  I don't believe so, your

 7    Honor.

 8            MR. KRUPP:  Nor do I.

 9            THE COURT:  With regard to Mr. Lacey, I have

10    the presentence report as to which there are no

11    objections.  I have the plea agreement.  I have the

12    government's sealed 5(k)(1.1) motion.  And I have some

13    letters that were filed today, two weeks late, but which

14    I've read carefully concerning Mr. Lacey.

15        Is there anything else I should have received and

16    read?

17            MR. RICHARDSON:  No, your Honor.

18            MR. SHEKETOFF:  No, your Honor.

19            THE COURT:  I'd like to -- well, this may be

20    worth some discussion, particularly with regard to

21    Mr. Owens' 5(k)(1.1) motion, which would provide the

22    foundation for any below guideline or statutory minimum

23    sentence, but I think that the section -- well, I think

24    the Advisory Guideline System we're operating under

25    should also be recognized.

1    In **Gall**, last December, the Supreme Court wrote at

2    596: "The District Court should begin all sentencing

3    proceedings by correctly calculating the applicable

4    guideline range.  The guideline should be the starting

5    point and the initial benchmark.  The guidelines are not

6    the only consideration, however.  Accordingly, after

7    giving both parties an opportunity to argue for whatever

8    sentence they deem appropriate, the District Judge

9    should then consider all of the Section 3553(a) factors

10   to determine whether they support the sentence requested

11   by a party.  In so doing, he may not presume that the

12   guideline range is reasonable.  He must make an

13   individualized assessment based on the facts presented.

14   If he decides that an outside guideline sentence is

15   warranted, he must consider the extent of the deviation

16   and ensure the justification is sufficiently compelling

17   to support the degree of a variance.  We find it

18   uncontroversial that a major departure should be

19   supported by a more significant justification than a

20   minor one.  After settling on the appropriate sentence,

21   he must adequately explain the chosen sentence to allow

22   for meaningful appellate review and to promote the

23   perception of fair sentencing."

24       Let me ask you this.  Do the parties agree that

25   that's the framework with regard to Mr. Lacey at least?

1          MR. RICHARDSON:  Yes, your Honor.

2          MR. SHEKETOFF:  I do.

3          THE COURT:  And is that also applicable, in

4     the government's view, to Mr. Owens?

5          MR. RICHARDSON:  Your Honor, the only

6     distinction I would draw with Mr. Owens, and this is

7     relying on the case that Probation cited in response to

8     an objection --

9          THE COURT:  What's the case?

10         MR. RICHARDSON:  It's the **Allers** case, I

11    believe it is.

12         THE COURT:  Let's see.  Let me see if I can

13    find it.

14         (Pause.)

15         MR. RICHARDSON:  It's on Page 44 of the final

16    report and it's **U.S. vs. Allers**, 305 F. 3rd at 54.

17         (Pause.)

18         THE COURT:  What's the year?

19         MR. RICHARDSON:  It's 2002, your Honor.

20         THE COURT:  Yes.  So that's a pre **Gall** case?

21    Pre **Booker?**

22         MR. RICHARDSON:  It is, your Honor, and I

23    thought of that, but I think given that what the First

24    Circuit was doing there was construing the statute,

25    3553(e), as a matter of statutory construction, the

```
 1    First Circuit was of the view that going down from a

 2    mandatory minimum sentence under 3553(e), which would

 3    specifically reference substantial assistance, it's the

 4    view of the First Circuit that the reduction below --

 5    any reduction below the mandatory minimum should be

 6    based on the substantial assistance and not other

 7    factors.

 8              THE COURT:  Well, at the appropriate point

 9    I'll look at the case, which is not in the file or at

10    least accessible to me now.

11              MR. RICHARDSON:  Your Honor, I think I did

12    print it out.  I've got a copy of it, I believe.

13              THE COURT:  305 F. 3rd 54.  Are there any

14    cases on this since *Booker* and *Gall*?

15              MR. RICHARDSON:  I did a quick Westlaw word

16    search and I didn't find anything that changed it.

17              THE COURT:  Okay.  Well, let's see.  I think

18    it's also agreed -- let me ask you this.  Mr. Krupp, do

19    you agree that I'm constrained by the 5(k)(1.1)

20    factors?

21              MR. KRUPP:  I do not think you're constrained

22    by the 5(k)(1.1) factors.  I do think that *Allers* is

23    decided under 3553(e), but I do think it's a pre *Gall*,

24    pre *Booker* formulation.  And I do think that even in

25    applying the 5(k)(1.1) factors, your Honor, you could
```

1    consider the 3553(a) factors.

2              (Pause.)

3              THE COURT:  It does say:  "The sentence shall

4    be imposed in accordance with the guidelines and policy

5    statements issued by the sentencing commission."  That's

6    a statutory directive.  The guidelines generally are now

7    advisory.  It's an interesting question.  I'm sorry

8    nobody but the Probation Officer addressed it.

9              MR. KRUPP:  Under 5(K)(1), your Honor, your

10   Honor is directed to determine the appropriate reduction

11   "for reasons stated that may include but are not limited

12   to consideration of the following factors."  So there's

13   a permissive, there's an openness there in the language

14   that allows your Honor to consider other things besides

15   itemized factors in 5(k)(1.1).  And I'd suggest that

16   post *Gall,* for sure, your Honor has the authority to

17   consider 3553(a) factors.

18              THE COURT:  And just so it can be focused on

19   in the arguments, as you know I've considered -- prior

20   to *Booker* and *Gall*, that I had discretion to consider my

21   perception of future dangerousness in deciding the

22   degree of the downward departure.  In other words, I

23   might give less of a reduction in sentence than the

24   government hypothetically might recommend if somebody

25   provided very valuable assistance to the government, but

```
 1    I felt the person would be dangerous if he got out as
 2    soon as the government's recommendation would let him
 3    out.  And the flip side of that is in figuring where,
 4    within the range of reason essentially under the
 5    articulated factors in 5(k)(1.1), I ought to sentence if
 6    somebody has demonstrated a significantly reduced risk
 7    of offending again.  I think that's a permissible
 8    consideration under 5(k)(1.1)(a).
 9         Okay.  I think the parties are in agreement that
10    we're operating under the manual now in effect, the
11    manual with the guidelines effective November 1, 2007
12    and as amended in March of 2008, correct?
13              MR. RICHARDSON:  Yes, your Honor.
14              MR. KRUPP:  Yes.
15              MR. SHEKETOFF:  Yes.
16              THE COURT:  All right.  And let me ask you
17    this.  Mr. Krupp, have you and Mr. Owens each read his
18    presentence report plus the memorandum of certain
19    information appended to it?
20              MR. KRUPP:  Yes.
21              THE COURT:  And other than the matters raised
22    in your objections, is there anything that you or he
23    think is inaccurate?
24              MR. KRUPP:  The -- there's only one thing that
25    I noticed.  If I could just have one moment.
```

```
1              (Pause.)

2              MR. KRUPP:  The only thing is on Page 2 of the

3    confidential submission.

4              THE COURT:  Hold on just one second.  Let me

5    get it.

6              (Pause.)

7              THE COURT:  Okay.  Page 2?

8              MR. KRUPP:  Yes.

9              THE COURT:  Okay.

10             MR. KRUPP:  And on Page 2, there's -- it says

11   that Mr. Owens is currently employed by that company and

12   that company recently downsized about four or five

13   months ago.  And Mr. Owens -- and this is accurate as of

14   the time that he was interviewed by Probation and what

15   have you, but he is no longer employed by that company.

16             THE COURT:  Is he employed elsewhere?

17             MR. KRUPP:  He is not now.  Oh, excuse me.

18   One second.  He is not now employed.  He has three jobs

19   he can start tomorrow, but he was waiting to see what's

20   going to happen in this case.

21             THE COURT:  All right.  I've noted that

22   Mr. Owens is not now employed.

23        All right.  Mr. Owens, is it correct -- well, put

24   it this way.  Did you read the presentence report in

25   that confidential memorandum?
```

```
1              MR. OWENS:  Yes, your Honor.

2              THE COURT:  And with the correction Mr. Krupp

3    just mentioned to me, do you believe the presentence

4    report is accurate except for the matters Mr. Krupp

5    objected to?

6              MR. OWENS:  Yes, your Honor.

7              THE COURT:  Okay.  And, Mr. Sheketoff, have

8    you and Mr. Lacey each read his presentence report?

9              MR. SHEKETOFF:  Yes, your Honor.

10             THE COURT:  And did you each read that --

11             MR. SHEKETOFF:  Confidential memorandum?

12             THE COURT:  Yes.

13             MR. SHEKETOFF:  Yes.  And when I say read it,

14   I mean I read it to him.  Given our circumstances where

15   we were physically located, I actually read it to him.

16             THE COURT:  Okay.  And there are no objections

17   that you've made.  Is there anything in his presentence

18   report that you regard as inaccurate?

19             MR. SHEKETOFF:  Not at the time it was

20   written, but since he's been transferred from state

21   custody to Federal custody.

22             THE COURT:  Okay.  I'll keep that in mind.

23   And, Mr. Lacey, did you read the presentence report and

24   did Mr. Sheketoff read to you the confidential

25   memorandum?
```

 1          MR. LACEY:  Yes, your Honor.

 2          THE COURT:  And is there anything in there

 3     that's inaccurate, in your view, other than the fact

 4     that you're now in Federal custody?

 5          MR. LACEY:  No, your Honor.

 6          THE COURT:  Okay.  You may be seated.

 7          (Is seated.)

 8          THE COURT:  I think we'll start with Mr. Lacey

 9     and then move to Mr. Owens because there are no

10     objections to Mr. Lacey's presentence report.  I have a

11     few questions that I would like to clarify.

12          In the plea agreement, the government reserved the

13     right to argue that Mr. Lacey's criminal history

14     category should be 4 instead of 1.  Is that correct?

15          MR. RICHARDSON:  We did reserve that right,

16     your Honor, yes.

17          THE COURT:  And the government, as I

18     understand it, is not making that argument?

19          MR. RICHARDSON:  That is correct, your Honor.

20          THE COURT:  And then the presentence report

21     points out that given the nature of the weapons involved

22     in the armored car robbery, with Mr. Lacey directly

23     involved, an upward departure based on Section 5(k)(2.6)

24     to 5(k)(2.17) might be appropriate.  Am I correct that

25     the government is not seeking that?

1          MR. RICHARDSON:  That's correct, your Honor.

2          THE COURT:  Why is that?

3          MR. RICHARDSON:  Your Honor, essentially --

4    actually, let me just check the plea agreement.  I don't

5    remember if we tied ourselves down with Mr. Lacey on

6    what the guidelines were as they worked out with respect

7    to him.  (Looks.)  Yeah, I don't remember particularly

8    focusing on this at the time, but we agreed that we

9    would not -- I believe we agreed that we would not seek

10   departures other than as set forth in the plea agreement

11   and we had subsequently reached some agreement on the

12   offense level without expressing or reserving the right

13   to depart upward.

14          THE COURT:  Because 5(k)(2.6) says:  "If a

15   weapon or dangerous instrumentality is used or possessed

16   in the commission of the offense, the Court may increase

17   the sentence above the authorized guideline range."

18   5(k)(2.17) starts by saying:  "If the defendant

19   possessed the semiautomatic firearm capable of accepting

20   a large capacity magazine in connection with a crime of

21   violence or a controlled substance offense, an upward

22   departure may be warranted."  This is an instance where

23   the prosecution has exercised some discretion and it, in

24   my view, contributes to the guideline range being as

25   it's calculated in the presentence report.  I don't

1    propose to depart upwards given that the government is

2    not going to advocate it in the circumstances of this

3    case, but the guidelines probably could be pegged higher

4    as a starting point.

5         But, as I understand it, for Mr. Lacey, I'll

6    accept the factual statements in the presentence report

7    as true and the Total Offense Level is 30, the Criminal

8    History Category is 1, the guidelines are 97 to 121

9    months, 24 to 36 months supervised release, a fine range

10   of 15,000 to 150,000 dollars, and a 200 dollar special

11   assessment.

12        Do the parties agree that those are the guideline

13   ranges for Mr. Lacey?

14             MR. RICHARDSON:  Yes, your Honor.

15             MR. SHEKETOFF:  Yes.

16             THE COURT:  Okay.  Mr. Owens will require some

17   decisions.  Basically -- I mean, I think the overriding

18   issue is whether Mr. Owens is an armed career criminal

19   within the meaning of Section 4(b)(1.4).  And if I have

20   it right, and I may not, the Probation Department found

21   that there were two reasons why he's an armed career

22   criminal.  One, is that he's plead guilty to being a

23   felon in possession of a firearm, which is a crime of

24   violence, and that he has qualifying predicate

25   convictions in Paragraphs 45, 46, 49, 51, 52 and 53.

1        In addition, Probation finds, under

2    4(b)(1.4)(b)(3), that Mr. Owens possessed a firearm in

3    connection with a crime of violence, that is, conspiracy

4    to commit an armed robbery, and it relies on Application

5    Note 1 to Section 4(b)(1.2), which says:  "A crime of

6    violence includes the offenses of aiding and abetting

7    and conspiring and attempting to commit such offenses."

8        Have I accurately stated Probation's analysis or

9    have I confused it in some way?

10              PROBATION OFFICER:  I think it's a bit

11    confused, your Honor.

12              THE COURT:  Go ahead.

13              PROBATION OFFICER:  I found that he's an armed

14    career criminal because he has plead guilty to 18 U.S.C.

15    922(g), the felon in possession of a firearm count, and

16    he has at least three prior convictions for a violent

17    felony or a serious drug offense committed on occasions

18    different from another, and those are Paragraphs 45, 46,

19    49, 51, 52 and 53.  The analysis that you were just

20    discussing is how I determined what his Total Offense

21    Level was and what his Criminal History Category was.

22    Armed career criminal offers a variety of options for

23    those.

24              THE COURT:  All right.  Okay.  So the idea

25    that he possessed a firearm in connection with a crime

1    of violence --

2                PROBATION OFFICER:  Is why his Offense Level

3    is 34 and why his Criminal History Category is 6.

4                THE COURT:  Actually, I think that's what I

5    said.  Yeah, I thought there were two reasons he was an

6    armed career criminal, but anyway.  Mr. Krupp.

7                MR. KRUPP:  I actually think your Honor got it

8    just right.  We don't contest that Mr. Owens is an armed

9    career criminal.  There are the predicates.  The

10   question is whether, under the ACC guideline, Mr. Owens

11   starts at a Base Offense Level of 34 or 33?  And that

12   relates to the underlying nature of his involvement in

13   this offense.  Which I think, as charged and as he has

14   admitted to, is a conspiracy to aid and abet an armed

15   robbery, not a conspiracy to commit the armed robbery.

16               THE COURT:  I've actually never heard of a

17   conspiracy to aid and abet.  I thought aiding and

18   abetting a conspiracy are two often overlapping, but

19   distinct forms of legal principles that create joint

20   liability.

21               MR. KRUPP:  Well, interestingly, the Count 1

22   of the second superseding indictment charges a 1951

23   offense, conspiracy to affect commerce by robbery --

24               THE COURT:  What page?

25               MR. KRUPP:  In violation of both --

1          THE COURT:  What page are you on?

2          MR. KRUPP:  I am on Page 1 of the second

3     superseding indictment.  But then if you jump to Page 3

4     of the second superseding indictment, the conspiracy is

5     in violation of 18 U.S.C. 1951 and 2, which is the

6     aiding and abetting.  And I think on the facts of this

7     case, Mr. Owens is, um, fairly charged with conspiracy

8     to aid and abet, given his role of what he did, but not

9     conspiracy to do the armored car robbery.  And I think a

10    conspiracy -- and it may be that under the guideline, a

11    conspiracy to aid and abet, if one can have such a

12    thing, is itself a crime of violence.  I couldn't find

13    any cases on it.  As far as I know there aren't any.

14          THE COURT:  I can't -- in the more than 30

15    years I've been involved in, from one perspective or

16    another, with Federal criminal prosecution, I can't

17    think of any case in which it was charged that one aided

18    or abetted.  I can't think of somebody being charged

19    with a conspiracy to aid or abet.

20          MR. KRUPP:  I think that is what is charged,

21    though, in Count 1.  To be sure, both a conspiracy

22    independent of aiding and abetting and a conspiracy

23    involving aiding and abetting are charged.  But on the

24    facts of this case, Mr. Owens is asked, "Can somebody

25    use his apartment to come back to after they do an

1    offense?" and he acquiesces, he agrees.  And I think

2    that that's why he is -- it's an aiding and abetting and

3    it's really a conspiracy to aid and abet, an agreement

4    to allow them to come back.  So --

5              THE COURT:  Well, I think -- I had thought

6    that he was agreeing to participate in the armored car

7    robbery not by going to rob the armored car, but by

8    agreeing that his apartment or his room in the sober

9    house could be used to stash the weapons before and

10   after the robbery and usually when I instruct on

11   conspiracy I say that conspirators can have different

12   roles and some can be much smaller than others.  But --

13             MR. KRUPP:  If I may, your Honor?  The reason

14   I didn't brief this is because it's plus or minus 8

15   months on the starting point.  And not to say that 8

16   months doesn't matter, it does, but the Government's

17   position, and Probation's position is that the low end

18   of the applicable guidelines is 188 months.  If I were

19   to prevail on this argument, we would have a starting

20   point of 180 months because of the mandatory minimum.

21             THE COURT:  Okay.  Mr. Richardson, do you want

22   to be heard?

23             MR. RICHARDSON:  Just briefly, your Honor.  It

24   would have been better to leave the "and" or "to" off

25   the end there on Page 3, but I think your Honor is

1   absolutely right, that it simply includes a conspiracy

2   to rob an armored car.  And Mr. Owens' role is that set

3   forth in the first overt act in furtherance of the

4   conspiracy, that you can be both an aider and abetter

5   and a conspirator and that's what Mr. Owens was in this

6   case.

7              THE COURT:  All right.  Let see.  This

8   objection is -- at this point you're accepting the

9   reliability of the predicates, so -- where is this in

10  the addendum?

11             MR. KRUPP:  It's Objection Number 13 in the

12  addendum on Page 40 of the final PSR.

13             THE COURT:  Well, I find that this is a -- the

14  defendant has plead guilty to conspiring to commit a

15  robbery affecting commerce in violation of the Hobbs

16  Act, Section 1951, and that is a crime of violence

17  because under the guidelines, particularly Section

18  4(b)(1.2), as explained in Application Note 1, a

19  conspiracy to commit a violent crime is a violent crime

20  for guideline calculation purposes.

21         In the circumstances, and I've reviewed all of

22  these, but, Mr. Krupp, do you think there are any other

23  rulings I ought to make?

24             MR. KRUPP:  I don't think your Honor needs to

25  address the other guideline objections that I've made.

1    Your Honor has resolved that and we have a starting

2    point at the low end of 188.

3            THE COURT:  All right.  And do you want me to

4    resolve any of them?  Because basically you had raised a

5    question as to whether there was adequate evidence of

6    some of the convictions, but I'm not aware that the

7    information is unreliable.  So I think we'll just go on

8    from here.  I'm going to deem the others as not

9    necessary to resolve and they're not going to affect my

10   sentence.  They're much more fundamental issues.

11       Well, based on the ruling I've just made then, the

12   Total Offense Level is 31, the Criminal History Category

13   is 6, the guidelines are 188 to 235 months, there's 36

14   to 60 months of supervised release, a fine range of

15   15,000 to 150,000 dollars, and a 200 dollar special

16   assessment.

17       Do the parties agree that those are the guideline

18   ranges?

19            MR. RICHARDSON:  Yes, your Honor.

20            MR. KRUPP:  Yes, Judge.

21            THE COURT:  All right.

22            (Pause.)

23            THE COURT:  All right.  What are the

24   government's recommendations with regard to each

25   defendant and what are the reasons for them, to the

1    extent that what we've discussed previously I will keep

2    in mind?

3                MR. RICHARDSON:  Yes, your Honor.  The

4    government is recommending, as indicated in the motions

5    filed under seal, that with respect to each of these

6    defendants a 50 percent reduction off the low end of

7    their respective guideline sentencing ranges.  So

8    specifically for Mr. Lacey, we're recommending a term of

9    incarceration of 49 months as well as 3 years of

10   supervised release and a mandatory 200 dollar special

11   assessment.  And with respect to Mr. Owens, a term of

12   incarceration of 94 months, 3 years of supervised

13   release, and a mandatory 200 dollar special assessment.

14       And with respect to each of them, albeit in

15   different ways, they both provided some material, some

16   substantial assistance in the prosecution of three very

17   dangerous and violent individuals, Dennis Quirk, Martin

18   O'Brien, and Arthur Burgess.  That they did so in

19   different ways and at different times, but the

20   government regards what each of these individuals did as

21   significant.

22                THE COURT:  Let me ask you this.  Isn't there

23   a fourth individual, although not a co-defendant in this

24   case, who had been indicted as a result of their

25   cooperation?

1          MR. RICHARDSON:  I believe as a result of the

2    cooperation of one of them, your Honor.  Of Mr. Lacey.

3          THE COURT:  Go ahead.

4          MR. RICHARDSON:  They both have provided

5    cooperation in connection with another state matter, but

6    my understanding is that it's Mr. Lacey, his

7    cooperation, which has led to that, although Mr. Owens

8    has cooperated certainly to the extent that he was able

9    to in that case as well.  And I'm relying, to a large

10   extent, on the motions we filed and what was said in the

11   lobby with respect to the cooperation of each.  I know

12   the Court is interested in sort of the --

13         THE COURT:  Well, we'll get there in a minute,

14   the question I alerted you to, but -- you know, I do

15   have to focus, at least primarily, on the 5(k)(1.1)

16   factors and the circumstances of the crime.

17         MR. RICHARDSON:  Yes, sir.

18         THE COURT:  But am I correct that Mr. Owens'

19   cooperation could not have been more timely?

20         MR. RICHARDSON:  It was right up front and it

21   enabled us to immediately get process against the three

22   individuals I just named.

23         THE COURT:  And did it involve danger or risk

24   of injury to him or people close to him?

25         MR. RICHARDSON:  Um, certainly, reading the

1    complaints, somebody right up front would determine that

2    he had provided information immediately, so to that

3    extent --

4              THE COURT:  Well, even if it wasn't immediate,

5    I'm talking about his cooperation generally.  I mean,

6    these are the fourth and fifth sentencings in this case

7    that I've conducted, so, as I recall, although this has

8    become somewhat protracted, I gave Mr. O'Brien a 15 year

9    sentence, including an upward departure, I gave

10   Mr. Burgess a 262 month sentence, which is more than 20

11   years, and I gave Mr. Quirk a 300 month sentence, which

12   is what, 25 years, right?

13             MR. RICHARDSON:  Yes.

14             THE COURT:  And these are guys who, along with

15   Mr. Lacey, were in the North End who with an AK-47 and

16   other automatic weapons -- these were dangerous -- you

17   know, they were prepared to use it on a crowded street,

18   Hanover Street, right?

19             MR. RICHARDSON:  Yes.

20             THE COURT:  These are dangerous people.

21             MR. RICHARDSON:  Very dangerous people.

22             THE COURT:  And they weren't trying their

23   first armored car robbery.  You now know and deeply

24   believe they engaged in a number of dangerous armored

25   car robberies or attempted robberies.

```
 1              MR. RICHARDSON:  Absolutely, your Honor, and,

 2    in fact, O'Brien and Quirk have been charged with one of

 3    them down in Norfolk.  So they're very dangerous people

 4    and we certainly know what Mr. Owens had done and what

 5    he was prepared to do had they gone to trial.  So he

 6    certainly was out there in terms of that.

 7              THE COURT:  And am I correct in understanding

 8    that you feel that Mr. Owens did everything he could do

 9    to assist?

10              MR. RICHARDSON:  Yes, although he was a little

11    bit hamstrung because he had been arrested and so

12    there's only so much you can do in that situation.

13              THE COURT:  Well, he had been arrested and his

14    cooperation was disclosed in the complaint.

15              MR. RICHARDSON:  Well, exactly, and I don't

16    think there was very much else he would have been in a

17    position to do at that point.

18              THE COURT:  And do you find it truthful,

19    complete and reliable, the information that he

20    provided?

21              MR. RICHARDSON:  Yes.

22              THE COURT:  And was it significant and

23    useful?

24              MR. RICHARDSON:  Yes, absolutely, both in

25    terms of the ultimate case and as I indicated up front,
```

1    perhaps the most important thing was that it enabled us

2    to get these three individuals off the street right

3    away.  And as I've told the Court, since June of 2005,

4    there have been no armored car robberies, no armored car

5    robbery attempts in this area.  And I think if they had

6    not been taken off the street, the likelihood is that

7    there would have been.

8            THE COURT:  And possibly deaths or serious

9    injury?

10           MR. RICHARDSON:  Absolutely.  The case in

11   Norfolk, one of the armored car guards was shot in the

12   leg and would have bled to death but for the fact that

13   there was a nurse across the street.

14           THE COURT:  So Mr. Owens, and we'll get to

15   Mr. Lacey in a moment, provided very valuable assistance

16   to the government and the public you represent?

17           MR. RICHARDSON:  Yes.

18           THE COURT:  And you've read the letters on

19   behalf of Mr. Owens, I assume?

20           MR. RICHARDSON:  I have, your Honor.

21           THE COURT:  These guidelines start high

22   because of his armed career criminal status and his long

23   criminal history, but I know Mr. Krupp will argue and it

24   seems to me that at least since his involvement in this

25   case, he's really made a determined and successful

1    effort to stay sober and off drugs and because the case

2    has gone on for a long time and he has behaved in a

3    law-abiding way for a significant stretch, you know,

4    causes me to think that, you know, perhaps he's not

5    nearly as dangerous as somebody who, so fully, earned

6    his way into armed career criminal status.  That I don't

7    know what -- you know, how you address that observation

8    of how it ought to be taken into account in the context

9    of this case.

10            MR. RICHARDSON:  I definitely see the Court's

11   point.  Um, my take on that is that for better or for

12   worse, somebody who has the sort of record that

13   Mr. Owens has, having anything to do with guns, much

14   less the sort of guns involved in this case, is almost

15   the ultimate third rail, it's something you just have

16   got to stay away from.  So I absolutely think that his

17   contribution to this case was extremely significant, was

18   very important.  I keep coming back to it because, I

19   think, probably the most important thing is how timely

20   it was, but at the same time, given his past, um, his

21   conduct was serious.

22            THE COURT:  Oh -- but, yes, but I'm asking you

23   a different question because, actually, I don't have any

24   doubt about that.  Anybody who played any role in this

25   was engaged in something dangerous and was facilitating

1    something dangerous.  But my point is, that looking

2    ahead -- I mean, frequently I get an armed career

3    criminal and we've got to lock that person up for a long

4    time because -- and often related to drug abuse, they've

5    just continued to commit crimes and even if they've

6    served time in prison, it doesn't deter them, it doesn't

7    rehabilitate them, they're still dangerous, so they have

8    to be locked up to protect society.  But because this

9    case has necessarily taken a long time to get to this

10   point and because Mr. Owens has been out, he's behaved

11   in a way that strikes me as impressive.  He's got that

12   letter from the Chelsea Police Chief that I think is

13   very unusual and meaningful.

14        So in terms of -- you know, I'm wondering whether,

15   in effect, articulated in guideline terms, you know,

16   whether Criminal History Category 6 doesn't overstate

17   the risk of recidivism.  Somebody who was a drug addict

18   and committed crimes repeatedly, at least, you know,

19   seems to have beaten the addiction as much as anybody

20   can demonstrate has beaten the addiction and therefore

21   is less dangerous than the crimes that put him in

22   Category 6 suggests.  That's what I was hoping you would

23   address.

24        MR. RICHARDSON:  I'm sorry, your Honor.  I do

25   think he has had a good, very good track record since

1    he's been out.  I was against his being released, your

2    Honor, as you will probably remember and your Honor was

3    right and he's done well out.  So I do think that in

4    terms of a risk of recidivism, he's, you know, candidly

5    at a much lower risk of recidivating than he was back

6    when he was in the midst of the throws of his drug

7    addiction and I think he's taken steps to address that.

8                THE COURT:  And then, again, so you can

9    address it, and this will help me, and Mr. Krupp will

10   address it as well, that I think sentencing is a

11   meaningful message about sending -- a meaningful measure

12   about sending messages and the one message that always

13   has to be sent is a message relating to deterrence --

14   specific deterrence, "Don't commit crimes in the future,

15   if you do, you'll get caught, you'll get convicted, and

16   you'll get punished," and general deterrence, sending

17   that message to other people.  But particularly when

18   there's a substantial assistance motion, there's another

19   set of messages that complicate the analysis and that's

20   especially true when there's been some sort of addiction

21   involved.  Because one of the messages I hoped to send

22   at this point is "No matter what your criminal past has

23   been, it's not too late, if you go in, if you help the

24   government against dangerous people at risk to

25   yourself."  That that sends a message to me that the

1  degree of danger you present is diminished, that you're

2  trying to separate yourself from that criminal element.

3  And I feel a certain obligation to send a message that

4  that difficult decision to make will be recognized and

5  reasonably rewarded.

6      And then in this case, with regard to Mr. Owens,

7  there's another message and that is "If you've been a

8  drug addict virtually all of your life, it's hard to

9  break that addiction and it's hard to stop the cycle of

10  crime and punishment, which the record, up until

11  recently, reflects, but if you make a determined and

12  successful effort, that, too, will be recognized."  And

13  I, frankly, you know, have a concern about, you know,

14  just given how high he started, you know, taking 50

15  percent off is sufficient to send that combination of

16  messages in the right proportion.  Do you want to

17  address that?

18          MR. RICHARDSON:  Again, I understand what the

19  Court is saying and I think it, in part, comes back to

20  that, the ***Allers*** case, really the assessment of the --

21  or the basis for the recommendation and the 50 percent

22  off is based on the cooperation in this case, which

23  again is very significant.  And I hope and think that

24  it's significant enough that people in Mr. Owens' place

25  in the future will see the benefit of coming forward.

 1    It's a long time, but it's half of a -- of an even

 2    longer time.  And that really is the basis for the

 3    recommendation, is the trying to reward the significant

 4    and substantial assistance he made while, at the same

 5    time, doing so based on what our starting point is, not

 6    just based on the -- well, based on the guidelines, but

 7    on the armed career criminal statute, which would put a

 8    floor of 15 years on the motion.

 9              THE COURT:  So there would be a mandatory

10    minimum of 15 years?

11              MR. RICHARDSON:  It would have been absent

12    that, which is why we did the combined 5(k)(1) and

13    3553(e) motion.

14              THE COURT:  And then you know I had a question

15    about the relevant sentences here.  And I understand

16    that a major concern is diminishing unwarranted national

17    disparity.  But, first of all, I think that in some of

18    the disparity -- I'm being asked now to impose a

19    sentence and explain it in a way that the public would

20    find it persuasive of 98 months, 94 months on Mr. Owens,

21    whose role in this offense was to say, "You can use my

22    closet, you know, to keep your AK-47 and other automatic

23    weapons," and 49 months on Mr. Lacey -- and I don't

24    remember whether he actually physically held one of the

25    weapons, but he's in the vehicle with people who are out

1    there with him on Hanover Street.  They have an AK-47,

2    they have a Sig Sauer, as I recall.

3              MR. RICHARDSON:  Yes.

4              THE COURT:  And I think the last time you told

5    me that they had the hollow-point bullets, which are

6    particularly devastating.

7              MR. RICHARDSON:  Yes.

8              THE COURT:  And so you could have asked me to

9    depart upward and maybe, when we started, closer

10   together, but you chose not to do that.  That's a

11   form -- you know, an exercise of discretion, but it's

12   exercised in the U.S. Attorney's Office, not public by a

13   judge, but that's where we are.  You know, why would I

14   give the guy riding around in the car with the AK-47

15   half the time I give the guy who lent his closet?

16             MR. RICHARDSON:  Um, let me respond this way,

17   your Honor.  First, I think we could have moved for

18   upward departures for both of them, so that, you know,

19   arguably -- although the armed career criminal

20   guidelines do work a little bit differently, but I think

21   we certainly -- and I'm trying to remember, um -- I

22   think we did make the motion with respect to Mr. Burgess

23   to go up from that guideline.  So basically I think

24   that's kind of -- that both of them got the benefit, to

25   an extent, of our not having done that.

1          I guess, I look at it more, and I think the public

2     would look at it more in terms of the percentage

3     discount based on the sentences.

4              THE COURT:  Why do you think that?  I mean

5     here you've got somebody who, A, as I say, played a

6     lesser role, although it's a conspiracy.  You know, he

7     gave his closet.  He wasn't prepared to go out on the

8     street where the bullets were going to be flying.  He

9     used bad judgment, but he drew the line.  And because he

10    has that impressive performance since I let him out,

11    because I thought he was entitled to it under the law,

12    and you recognized that he's done so much better than

13    most of the people that you and I see.  Even if I let

14    him out, he's been out for three years -- not too many

15    of them are out for three years because even if they're

16    a good risk, a lot of them just can't stand the pressure

17    and I have to lock them up.

18         So, you know, here's somebody who's been working,

19    who's been earning the confidence of the Police Chief of

20    Chelsea and a lot of people at his AA group and, you

21    know, he just doesn't seem that dangerous anymore.  I

22    don't know.  If somebody knew all the facts, which is

23    hard for them to know, but you know them and I know

24    them, then I think they would have a lot of trouble

25    understanding why Mr. Owens got twice as much time as

1    Mr. Lacey.

2              MR. RICHARDSON:  Again, your Honor, to a large

3    extent it's because of the jumping off point.  I can

4    point out some things that Mr. Lacey did that Mr. Owens

5    didn't do, but on the other hand, part of that was

6    because he wasn't in a position to do it.

7              THE COURT:  But they both did everything they

8    could before the guidelines -- and I'll say two things,

9    some of which I probably said to you before.  But the

10   initial draft of the guidelines in 1986, on which I

11   testified for the First Circuit, had percentages.  You

12   know, if somebody gets prosecuted, it's so much, and if

13   two people get prosecuted, it's so much more, and a

14   number of people, including me, said, "That's not a good

15   approach because the defendant can't control the value

16   of his assistance."  If one person tells you, "I paid a

17   bribe to the Mayor," you don't have a prosecutable

18   case.  If two of them do, you very well may have an

19   important case.  And each of them has been as helpful

20   and as truthful as they possibly could be.  But there's

21   jurisprudence that preceded the guideline, you know,

22   that says that, you know, the fact that somebody will

23   cooperate against a former confederate, particularly

24   when they're dangerous people, tells you something about

25   whether they're likely to be dangerous in the future.  I

```
 1    mean, that's the biggest factor to me all the time in
 2    sentencing, "Do I have to protect society from this
 3    person and if so for how long?"
 4         So I think to the extent it's permissible, in a
 5    common sense way, the fact that, as you commendably as
 6    well as candidly recognize, Mr. Owens has done very well
 7    in the last couple of years, three years, and to me that
 8    is relevant to the analysis, although maybe it won't
 9    affect the ultimate outcome.  But this sort of
10    intradefendant disparity also has some common sense
11    appeal and I'll think about whether I have the
12    discretion to use common sense.  Is there more you would
13    like to say?
14              MR. RICHARDSON:  No, I think that's it, your
15    Honor.
16              THE COURT:  All right.  Thank you.
17    Mr. Krupp.
18              MR. KRUPP:  Thank you, Judge.  Does your Honor
19    want to hear argument on the appropriate sentence?
20              THE COURT:  Absolutely.  Now is the time.
21              MR. KRUPP:  Thank you.  I am asking your Honor
22    to impose a sentence of time served.  Mr. Owens has
23    served 5-plus months in prison before your Honor
24    released him.  And I'm asking your Honor to impose the
25    maximum term of supervised release, which is 5 years,
```

1    and to recommend that Mr. Owens participate in the CARE

2    program.  He is absolutely --

3                    THE COURT:  What program?

4                    MR. KRUPP:  The court drug and alcohol

5    assistance program through Magistrate Judge Sorokin.

6    Mr. Owens is the perfect candidate.  He would be not

7    just benefiting from it, but he would benefit all of the

8    other participants in it if he were in it.

9                    THE COURT:  Actually, hold on just one second.

10                   (Pause.)

11                   THE COURT:  Go ahead.

12                   MR. KRUPP:  The -- so that's what I'm asking

13   for and I think it's an appropriate sentence for a

14   number of reasons.

15        Number 1 is the 5(k)(1) factors.  Mr. Richardson

16   is obligated to ask for what the 5(k) committee of the

17   U.S. Attorney's Office authorized him to ask for.  I

18   think he's been more than candid to your Honor in

19   acknowledging the extent and utility and importance of

20   Mr. Owens' cooperation.  But in my experience, the U.S.

21   Attorney's Office limits their recommendations to 50

22   percent or less below the low end of the guideline

23   range.  And I think that in this case the extent and

24   nature of the cooperation was greater than usual.

25                   THE COURT:  Is Mr. Owens from Charlestown?

1          MR. KRUPP:  He absolutely is.

2          THE COURT:  And is Charlestown the place that

3     used to be infamous for its code of silence?

4          MR. KRUPP:  It is.  It is, your Honor.  And

5     Mr. Owens was very involved in Charlestown.  He was

6     involved in AA meetings, in groups there, and as a

7     result he has had to absent himself from there.  His

8     mother worked there and people came up to her, after

9     Mr. Owens started to cooperate, and said, "Hey, what's

10    your son doing?"  There was significant risk involved to

11    Mr. Owens and frankly his relatives by virtue of what he

12    chose to do, and what he chose to do was to turn his

13    life around, and that was the first step of that

14    change.  In fact, he had been sober for some time before

15    and he continued that sobriety and was committed to it.

16         So in terms of your Honor's questions before about

17    future dangerousness, I think that the fact that the

18    cooperation counsels strongly against future

19    dangerousness, I think your Honor correctly recognizes

20    the amount of pressure on Mr. Owens during the last

21    three years and that that's been significant and against

22    that he has maintained his sobriety.  In fact, he has

23    strengthened it.  He knows that he can't slip up.  He

24    has a tremendous support network, behind me now and

25    behind him going forward, and that's developed, um,

1   because of what he's done.  It's because of him being

2   there for other people.  It's because of his consistent

3   contribution to AA and to help foster other people's

4   sobriety.

5        Mr. Owens got a job after he got out and he was

6   working as a fruit broker or a food broker and he was

7   very successful in that position.  And because of

8   certain things that happened in his job, unrelated to

9   Mr. Owen's performance, he lost that 3 or 4 or 4 or 5

10  months ago.  And at that time the other co-defendants in

11  this case were wrapping up their cases.  We didn't know

12  when your Honor was going to set the case down for

13  sentencing.  And Mr. Owens felt it was unfair to go and

14  start up a job with another company and then potentially

15  he may have to quit it.  So he made the decision not

16  to.  He has multiple job offers ready for him here and

17  in Florida where his mother is right now, and could

18  easily begin working.

19       He will be four years sober May 9th and that's

20  Friday -- this coming Friday.  He continues to go to 10

21  to 14 meetings, AA meetings a week, to help himself and

22  to help others.  And so in terms of future

23  dangerousness, I think that that is significant -- as

24  well as all the letters, that is significant evidence

25  that he is and will not be a significant risk of danger

 1  in the future.

 2          THE COURT:  How old is he now?

 3          MR. KRUPP:  37.

 4          THE COURT:  And if he got 15 years, that would

 5  take him to 53.  The government's recommendation is

 6  about 8 years, roughly.  And that would take him to 45.

 7          MR. KRUPP:  In terms of the Court's question

 8  about sentencing as a means of sending a message, um,

 9  there's no doubt that a message has been sent in this

10  case as a result of sentences imposed already in this

11  case.  And I don't mean to minimize what message should

12  be sent with respect to Mr. Owens' involvement, but I

13  think everybody in the room understands that Mr. Owens'

14  involvement was the least culpable of anybody who was

15  involved in this at all.

16      He lent his closet for roughly four or five days,

17  on two occasions each for a couple of days, and he

18  permitted others to come back to his apartment after the

19  robbery.  He wasn't there.  He didn't take custody of

20  anything.  He wasn't the hand-off guy or anything like

21  that.  In fact, when he got the call -- and

22  Mr. Richardson kept referring to when he was arrested,

23  but when he got the call to come into the police

24  station, he went into the police station.  They didn't

25  have to go out searching for him.

1           With respect to sentencing as a means of sending a

2     message, Mr. Owens has done terrific work for himself

3     and for others over the last three years and I'm

4     concerned that --

5                   THE COURT:  What has he done?

6                   MR. KRUPP:  For himself and others?

7                   THE COURT:  Yes.

8                   MR. KRUPP:  He's held a job.  He's maintained

9     his own sobriety against tremendous odds.  The PSR talks

10    about his father's history and involvement with drugs,

11    abuse growing up, his own history of drug abuse.  He's

12    maintained his sobriety for a long time.  He has gone

13    and helped literally dozens of people maintain their own

14    sobriety.  And he has substantially assisted the

15    government in prosecuting others.  He's limited by his

16    own knowledge, but he's stood ready, willing and able in

17    this case and in others to help, and he will do that.

18    And I think that that is -- that's huge and I think that

19    those are all factors your Honor can consider under

20    5(k).

21          What I don't want to have happen is all that be

22    thrown away.  And I know that that would bolster

23    Mr. Owens in the future --

24                   THE COURT:  And part of the problem is -- I'm

25    sorry.  Finish your point.

1          MR. KRUPP:  Well, my only concern is that to

2    send Mr. Owens away to prison for a small time or for

3    what the amount of time the government is advocating

4    will, to be sure, punish Mr. Owens, but it will not

5    allow him to build meaningfully on the kind of history

6    that he has built up over the last three or four years.

7          THE COURT:  Well, part of the problem is that

8    this is isn't just about Mr. Owens.  The victims, for

9    example, haven't come in today, but I have an obligation

10   to impose a sentence that reflects the seriousness of

11   the offense.  And he has a long history of committing

12   crimes.  He was in a sober house.  He was presumably

13   working on his sobriety then.  And while he had the good

14   sense not to agree to get in one of those vehicles --

15   and I don't know if they even asked him, where somebody

16   could have been shot and killed, because he was

17   facilitating that crime, because he was participating in

18   that conspiracy, um, you know, he was promoting the real

19   risk that somebody there on Hanover Street would get

20   killed.  That's serious.

21          MR. KRUPP:  And I don't mean to belittle that,

22   Judge, but I do think that even if it can't formally be

23   called a conspiracy to aid and abet, I do think that

24   that fairly describes what Mr. Owens' role was.  Nobody

25   suggests that Mr. Owens was invited or asked to

1    participate or thought for a second to get into the

2    car.  I put in several objections which added some facts

3    or some background to the statement of offense with

4    regard to Mr. Owens' involvement and it involved

5    Mr. Owens trying to dissuade them from doing it, even

6    saying -- trying to divorce himself from involvement by

7    saying he thought that his apartment was under

8    surveillance and they shouldn't come back to his

9    apartment.  So I think that his involvement really was

10   very limited and I understand he has to be punished for

11   his involvement.

12        The other thing I wanted to say is that his last

13   offense, his last conviction was for conduct in 1994, 14

14   years ago.  Again, I don't mean to diminish what his

15   record is, but it's a while ago.  I know he's going to

16   want to address you, your Honor.

17        THE COURT:  Okay.  Mr. Owens, you now have an

18   opportunity but not an obligation to speak before I

19   decide, probably after hearing more about Mr. Lacey,

20   what sentence to impose.  That means you don't have to

21   say anything if you don't want to, but if there's

22   something that you would like to say, now is the time.

23        MR. OWENS:  Right now, your Honor?

24        THE COURT:  Yes.

25        MR. OWENS:  Um, I'm going to make it brief.

 1    Of course, I, 100 percent, accept responsibility for my
 2    actions in this case and I know that it was a serious
 3    mistake, horrible judgment that I used, to allow myself
 4    to be involved in this in any way, shape or form.  You
 5    know, I keep hearing talks about "career criminal" and
 6    my past record.  Well, my past record, in all fairness,
 7    your Honor, myself, I know in my heart, that I'm not the
 8    man that is described in my past criminal record.  I
 9    know that in my heart.  Regardless of what transpires
10    here today, I am steadfast in staying sober and
11    continuing with the way I've been living my life in the
12    past three years.  Whether it's -- whether I have to
13    take a hiatus before I can start it back up again or I
14    can continue to do it today, that's not going to
15    change.
16        When I did cooperate in this case, it was the
17    worst thing that I could have possibly done, being a kid
18    from Charlestown labeled as a "rat," an informant, and
19    it knocked me for a loop, to be honest with you, your
20    Honor, but the way I look at it and the way I have to
21    look at it today, being sober, is that it was the day I
22    took my life back for the first time ever, that I
23    started thinking for myself, that I started to take
24    responsibility for myself, and to do the best with what
25    I have left on this planet.

1         And I know that as far as recidivism -- and I

2    can't say the word.

3              THE COURT:  Yeah, I have trouble with it, too.

4              MR. OWENS:  Thank you.  As far as that goes,

5    your Honor, I know just where I'm going.  I know.  I'm

6    terribly sorry for the people that were involved on

7    Hanover Street.  I am very, very grateful that no one

8    was injured, very grateful, because I know this would be

9    definitely different circumstances and my life would, no

10   question, probably be over as a free man.  And --

11        I don't know.  There's a lot of other things, your

12   Honor, that I've done since I've been home the last

13   three years to help other people in doing things, but

14   those things aren't going to be here.  They're not going

15   to show up in letters.

16             THE COURT:  Well, tell me about some of them.

17             MR. OWENS:  Well, I speak at a lot of DYS

18   youth lockups, bring AA meetings in there to them.  The

19   thing is, with the program, it's an anonymous program,

20   but there's times when we get calls at 2:00 or 3:00 in

21   the morning where a guy wants to drink and we've got to

22   run down to Mike's Donut and sit there with him for 5

23   hours just so he doesn't take that drink.  I can't tell

24   you how many times I've done that in the past three

25   years, your Honor.  And I do that only for my sobriety.

1    Nothing else.  Not for a letter for court or for

2    recognition here in this room today.  I do that to

3    maintain one day of sobriety.  And that's the only

4    reason why I have been able to stay sober is because men

5    have done it for me in the past.

6        I know my life would be nothing short of -- of

7    remarkable compared to my past if I was able to continue

8    it.  Like I said, I'm very, very steadfast in staying

9    sober and going back to work.  I have job opportunities

10   in several states, including Massachusetts.  I can pack

11   up and go to Sun City, California, tomorrow to work.  I

12   can work in Naples.  I can work in Boca Raton in

13   Florida.  I have people offering me construction foreman

14   jobs that were on crews down there.  The produce

15   business.  The casino business in California.  Lots of

16   opportunities that are available to me.

17           THE COURT:  When the time comes, I hope you

18   take a job someplace other than at a casino.  It might

19   test your sobriety.

20           MR. OWENS:  I would be a walks-and-grounds

21   guy, cutting the grass, that kind of deal.  I wouldn't

22   be a Black Jack dealer.

23       I don't know.  I just wanted to address the Court,

24   your Honor, and I wanted to thank the Court because this

25   last three years I was given the opportunity to do some

1    things with my life, in all honesty.  After the year

2    that I spent in the house under house arrest, I was able

3    to go out and get a job.  The connection that I have

4    today with my family is unbreakable and it's amazing and

5    that's because I was released and I was able to, you

6    know, spend time with my family and our bond has been

7    strengthened by this and my life has been strengthened

8    in many, many ways, and I'm very, very grateful to the

9    Court for that.

10            And I'm very grateful that no one was injured.  I

11    know I'm not taking away anything that anyone has

12    suffered in this case.  I know how it feels with having

13    certain objects pointed at you.  I've been there myself

14    many, many times and it's pretty emotional, pretty

15    grave.  And I apologize for being involved with that,

16    your Honor.  Thank you.

17                    (Pause.)

18                    THE COURT:  Let me ask you a question,

19    Mr. Owens.

20                    MR. OWENS:  Yes, sir.

21                    THE COURT:  If I had a good reason not to

22    sentence you today, but to put off your sentencing for a

23    period of time, do you think you'd be able to sustain

24    your sobriety and record of good works as you've just

25    described them?

```
 1                    MR. OWENS:  Without a doubt.

 2                    THE COURT:  It wouldn't put too much pressure

 3      on you?

 4                    MR. OWENS:  Not at all.

 5                    THE COURT:  And, you know, if that might be

 6      six months or a year or maybe even longer before you got

 7      sentenced, do you think you could find a job around

 8      here?

 9                    MR. OWENS:  Absolutely.

10                    THE COURT:  And would you like me to consider

11      that as one of the options?

12                    MR. OWENS:  Sure, your Honor.  Thank you.

13                    THE COURT:  All right.  Let me hear about

14      Mr. Lacey.

15           Is there any more you would like to say,

16      Mr. Richardson?

17                    MR. RICHARDSON:  No, your Honor.  I'll rest on

18      what I said earlier.

19                    THE COURT:  All right.  In fact, let me see

20      Mr. Krupp and Mr. Richardson at side bar.

21                    (Side bar is sealed.)

22

23

24

25
```

```
 1              (In open court.)

 2              THE COURT:  On Friday I denied a confidential

 3     request to continue Mr. Owens' sentencing.  That request

 4     has been renewed.  And while I'm going to take into

 5     account everything I've learned in preparing for today

 6     and I've heard today, I'm not going to sentence

 7     Mr. Owens today.  His pretrial release will continue on

 8     the same conditions.  But if there's any violation, any

 9     slippage, I want to know immediately and then we'll

10     probably resume the sentencing.  But -- and the

11     sentencing will be concluded at some point, but not

12     today.

13         All right.  Mr. Sheketoff, what would you like to

14     say with regard to Mr. Lacey.

15              MR. KRUPP:  Your Honor, may we be excused?

16              THE COURT:  No, not yet.  You never can tell

17     what will happen, which is probably why you want to be

18     excused.

19              (Laughter.)

20         MR. SHEKETOFF:  Mr. Krupp knows me very well.

21         Okay.  Your Honor has read the presentence report,

22     I'm sure, very thoroughly and I have a client with a

23     somewhat unique background who, um -- whose own personal

24     trust and his family's personal trust was violated when

25     he was in elementary school and I believe that a lot of
```

1    his behavior since then can be viewed through that

2    circumstance, including the drug usage, which is -- you

3    know, there was a settlement in this case, a significant

4    settlement, and I don't mean millions of dollars, but

5    hundreds of thousands of dollars over the Archdiocese of

6    Boston and that money was spent on drugs.  Just gone.

7         There have been -- since the --

8         THE COURT:  Part of the response to that is

9    that there have been other very unfortunate victims of

10   that type of crime, but they're not out on Hanover

11   Street riding around with people carrying AK-47s.

12        MR. SHEKETOFF:  There's no question about

13   that, your Honor.  But people do have different

14   reactions to the same sort of event.

15        You know, most people that got a significant

16   settlement from the Archdiocese are at home or someplace

17   else and, you know, were able to move on in some way.

18   And this is not just reflected in drug use, but there

19   have been three -- since 2005, three serious suicide

20   attempts.  You know, this is -- there's a certain level

21   of self medication, self hatred and an inability to cope

22   with what happened that is not unwarranted.  In any

23   event, that's part of the background.

24        Another part of the background -- and his family

25   is here, his wife is here, his father in law is here,

```
 1    his mother is here, his cousins are here, one of his
 2    brothers is here.  But another part is that he has this
 3    incredible family, um, that has -- I mean, he's had a
 4    relationship -- he has three children, young children.
 5    He has a wife that he's been with since I think he was
 6    about 17 years old and they had their first child when
 7    he was 19.  And the letters explain that he is a loving
 8    father, son and brother.  You know, he's obviously two
 9    different people at the exact same time.
10         And at some point after he got involved in this,
11    the pressure of it -- and as the presentence report
12    explains, it's not just the pressure of what it
13    involved, but it was the problem of the Archdiocese
14    coming to fruition in terms of court proceedings, that
15    there was a serious suicide attempt, and in part, as a
16    result of that, that he came forward and did what he
17    did.  And he's also Charlestown born and bred, the whole
18    code of silence thing.  He's going to be in the
19    "disappeared."  Whatever happens after he gets a
20    sentence in this case, he's going to disappear with his
21    wife and children.
22         So the guidelines, even as calculated, reflect the
23    seriousness of the offense, um, you know, they're
24    significant numbers to someone who basically has no
25    prior record, 97 months at the bottom, 6 levels up for
```

1    the gun.  Even though they could have asked for an

2    upward departure, it's still 6 levels up for the gun,

3    some significant number of levels up -- and I don't

4    remember exactly what it was, but for the amount of

5    money that was potentially involved, even though no

6    money was taken, 2 more levels up because it was a

7    financial institution as opposed to, you know, the

8    corner grocery store.  So in terms of one of the reasons

9    that any case like this, it seems to me, would cause any

10   judge pause is that there is a general deterrence

11   requirement and this is a very serious offense.

12        He's not one of the ones carrying the gun, but

13   that's -- you know, at least he's not one of the ones

14   carrying the gun.  I mean it's better than carrying the

15   gun.

16             THE COURT:  Well, what was he doing, driving?

17             MR. SHEKETOFF:  He was driving the car that

18   the robbers were going to follow out of it, sort of like

19   -- and I don't know what you would call it, but a "chase

20   car" or something, and then they were going to switch

21   into that car and then maybe they were going to switch

22   into another car.

23        So the government, in recognition of the danger

24   that he was in, in fact, the promptness of his

25   cooperation, without even being charged, has recommended

1    50 percent off, which in my experience is a significant

2    recommendation.  I've never had before today more than

3    40 percent off.  I thought their -- they always told me

4    that that was, you know, as far as they would go.

5         All right.  So if you give him 49 months, because

6    of this slip up that we talked about in chambers, he's

7    been incarcerated now for 19 months and 5 days,

8    approximately.  Um, with good time over the 49 month

9    sentence --

10              THE COURT:  Well, what sentence are you

11   advocating?

12              MR. SHEKETOFF:  Time served, because he's

13   already done 19 months and 5 days.  They would put him

14   into a disappearance program and he would have a chance

15   to start over again a new life with all the -- that he's

16   learned from this.  He was never incarcerated for a

17   second prior to this case.  You know, this is his first

18   taste of prison.  He's not like others in this case who

19   had, you know, some sort of warning and could understand

20   the level to which they were taking, you know, the next

21   step.  And it's been a very difficult 19 months and 5

22   days in part because he didn't trigger it, it happened

23   for his own safety, but it wasn't something that he had

24   triggered.  It wasn't something he was prepared for.

25         He was on a Methadone maintenance program that

1    basically just collapsed on him and there was a suicide

2    attempt within a couple of months.  He had a newborn

3    child that was conceived before he was put on

4    Methadone.  And, of course, it's been in, you know, the

5    worst kind of county facilities because of his own

6    safety in having to move him.  First he was in Rhode

7    Island where there were a series of suicide attempts and

8    then various counties here.  He's had to be particularly

9    careful because the reputation of being a cooperating

10   witness, which is discussed in slightly different terms

11   in the prison system, follows you around.

12        If you give him the 49 months the government has

13   recommended, he has 26 more months to do, minus the good

14   time and minus the time he's already done.  I'm sorry.

15   He has 23 more months to do, which is just slightly less

16   than 2 years.

17        Other than general deterrence -- and I understand

18   that, but other than general deterrence, there's no

19   advantage to society for keeping him separated from his

20   family and letting him open up this new chapter in his

21   life for 2 more years.  He's had the taste of prison for

22   almost 2 years, a year and a half.  He has an

23   appreciation of what the consequences are now in a way

24   that he never did before.  He's had 19 months of no drug

25   use.  I mean he's visibly changed, and even my eye,

1    which is pathetic at noticing changes -- he's changed.

2              THE COURT:  Has he got any drug treatment?

3              MR. SHEKETOFF:  Not really.  It was more in

4    the nature of no access.

5              THE COURT:  Right, which raises a concern

6    about how he would perform when he's released.

7              MR. SHEKETOFF:  Judge, I can't argue that

8    given what I think is the cause of his drug use and

9    given three serious suicide attempts, I can't, with a

10   straight face, argue that his future is all perfectly

11   rosy.  I don't think it involves crimes of violence

12   again, that there won't be a suicide attempt or there

13   won't be a relapse into drug use?  I can't promise

14   that.  I know he feels determined that it's not going to

15   happen, but I've been around long enough to know that

16   that doesn't always help.  It's certainly the first

17   step, but it's not a guarantee.

18        I just don't know, in terms of him, what another

19   23 months really accomplishes.  He'll still be -- he'll

20   go from 27, almost 28, to 29 almost 30.  Why would that

21   be more likely that he'll be able to do it?  He'll be 2

22   years further down the road in his kids growing up.  His

23   wife will be -- will have been without him for another 2

24   years.  You know, they're still there.  It's still --

25   it's there right now.  Whether he's going to take full

1    advantage of it or not, I can't promise the Court.  But

2    I think he's in a better position to take full advantage

3    of it now than 2 years down the road.

4        I know he's got the drive and the desire to take

5    advantage of it.  I know in many ways the Government is

6    going to give him the tools to do it, you know, to not

7    be a part of the Charlestown environment, to really have

8    a completely fresh start, and I just think the maximum

9    chance of him pulling that off is today as opposed to 2

10    years from today.  But I can't guarantee to the Court

11    that he will pull it off.

12        But he's done everything the government asked him

13    to do.  He's risked his life.  He's maintained his

14    family.  He's still here with us today.  And, um, I

15    think that time served with the longest period of

16    supervised release with whatever conditions you want to

17    put on his supervised release that makes sense to the

18    Court, including obviously drug screening and drug

19    treatment or whatever -- and I don't honestly know how

20    the "disappeared" do on supervised release.  I don't

21    know the practical answer to what occurs on that.

22        But I think my recommendation is reasonable.  This

23    is, of course, one of the 30 or 40 reasons why I'm never

24    going to be a Federal judge, because I think these

25    decisions are so difficult.  I mean I don't -- I mean,

1    there is general deterrence and there is this person's

2    life and how you balance that seems to --

3              THE COURT:  Well, there's also the need to

4    reflect the seriousness of the offense.

5              MR. SHEKETOFF:  And that's what I meant by

6    general deterrence.

7         You articulated a lot of things that I was going

8    to say, which is that there is these other policies

9    which is that when you do step forward and you do take

10   these risks and you do it in a very timely manner and

11   you do it even, in this case, before you've been

12   arrested, that there's something to be said for that,

13   too, and the policy behind that, that obviously today I

14   would argue that that entitles you to have the Court

15   consider your personal circumstances in a way that the

16   Court need not, to the same extent, when you fail to do

17   that.

18             THE COURT:  Mr. Lacey, you now have an

19   opportunity but not an obligation to speak before I

20   decide what sentence to impose.  That means you don't

21   have to say anything if you don't want to, but if

22   there's something that you would like me to consider,

23   now is the time.

24             MR. LACEY:  Your Honor, I first would like to

25   start off apologizing to my family for putting them

1    through this.  I just want to let you know I'm not the

2    same person now that I was when this all happened.  I've

3    been sober for a while.  I've got my head on straight.

4    I've actually seen a videotape from Mr. Richardson of

5    that scene on Hanover Street and I realize now how

6    dangerous it is and how stupid it was for, you know,

7    even being in that situation.  And I just want to let

8    you know that I'm sorry and I want to apologize to the

9    people in the North End, the people in Malden for

10   affecting their lives and putting them in danger.  Thank

11   you.

12            (Pause.)

13            THE COURT:  All right.  Mr. Lacey, please

14   stand.

15       The government's motion for a downward departure

16   is allowed.  With regard to the two counts to which

17   you've plead guilty, I hereby sentence you to serve 30

18   months in the custody of the Attorney General of the

19   United States to be followed by 36 months supervised

20   release on the standard conditions, which include the

21   requirement that you not commit another Federal, state

22   or local crime and that you not illegally possess a

23   controlled substance, that you may not use any

24   controlled substance unlawfully, and you shall

25   participate in up to 104 drug tests a year.  You must

1    submit to the collection of a DNA sample as directed by

2    Probation.  You may not possess a firearm or other

3    dangerous weapon.

4         In addition, you must participate in a program for

5    substance abuse treatment as directed by Probation,

6    which, as I said, may cause you to be tested up to 104

7    times a year, and if you have the money to contribute

8    through insurance, you must use that.  You may not

9    consume any alcoholic beverages.  You must participate

10   in a mental health treatment program as directed by

11   Probation and pay if you're able to pay.  You shall

12   participate in a GED preparation class, unless you

13   obtain your GED while you're incarcerated.  I'm not

14   imposing a fine because I find you cannot pay a fine,

15   even in installments.  There is, however, a mandatory

16   200 dollar special assessment.

17        You have the rights to appeal that you haven't

18   waived in your plea agreement, which were probably quite

19   limited, I believe.  You have waived your right to

20   appeal your conviction and your sentence because I've

21   allowed this motion for a downward departure.

22        The reasons for this sentence are rooted in

23   Section 5(k)(1.1), but as the government acknowledged, I

24   also can and I feel I must consider the statutory

25   Section 3553(a) factors.

1          The most fundamental reasons that this sentence is

2     30 months, which is less than a third of the original 97

3     months, and about -- well, more than two thirds of the

4     -- or about two thirds of the government's

5     recommendation are as follows.  As you now seem to

6     understand, you participated in a very serious crime.  I

7     mean, I've sentenced your co-defendants to as much as 25

8     years in prison and while you weren't carrying the

9     AK-47, you knew they were.  It really is just very

10    fortunate that nobody is dead.

11         But you came in and cooperated, as has been said

12    here, in open court at a time when you weren't under

13    arrest, when you had the hope that you might have

14    escaped getting caught and convicted for this, and you

15    had that hope that you might have escaped because, in

16    the community you come from, Charlestown, there, at

17    least, was a very strong code of silence.  You had

18    reason to genuinely hope that nobody would rat you out

19    and that you might get away with this.  But something

20    compelled you to go in and it says a lot for you.  It

21    doesn't say to me that you're a rat at all.  I mean, it

22    says to me that you really don't want to be this way.

23    That's not the person you want to be and it's not the

24    person you have to be.  You're not one dimensional.

25    This isn't the only thing that's ever happened to you in

 1    your life.

 2         But to go back to these guideline factors, which

 3    substantially influence the government and influence me,

 4    you went in relatively early on when you didn't have

 5    to.  You did it at great risk to yourself and people you

 6    deeply care about.  I mean, there's always a risk

 7    relating to cooperation, but when you come from

 8    Charlestown and you give evidence, you know, against

 9    people who were out there with AK-47s, that's dangerous

10    and you knew that.  You understood it better than I

11    understand it.

12         You did everything you could and some of it was

13    discussed back there, but it's a lot.  It's a lot.  And

14    you did that truthfully and completely in what you

15    provided as proof to be relied on.  As the Government

16    said, what you did and also what Mr. Owens did is very

17    significant, very useful to the government's judgment

18    and to mine.  It contributed to taking really dangerous

19    people off the street for decades.  And I think

20    Mr. Richardson makes an important point when he says

21    that since 2005, there haven't been any more attempted

22    armored car robberies in an area where there were quite

23    a few.  I think that's an indication of how dangerous

24    your co-defendants were and also gives us some hope that

25    this concept of general deterrence, or sending a message

1    to others, worked.

2        So those are the main reasons for the sentence,

3    but I've also considered these statutory factors.  The

4    nature and circumstances of the offense, as I said, it

5    could hardly be more serious.  You weren't carrying the

6    guns, but you knew that your co-conspirators were and

7    it's very fortunate that nobody was seriously injured or

8    dead.  But I've also considered your own history and

9    characteristics.  You haven't spent time in prison

10   before.  You have suffered genuine trauma that common

11   sense suggests contributed to your serious drug

12   problem.  You have those attempted suicides.  And they

13   can be taken into account at this point.

14       I'm obliged to issue a sentence that affords

15   adequate deterrence and that has two dimensions.  One,

16   it's necessary to send a message to you, "Don't do this

17   again.  You're not going to get away with it.  You're

18   going to get caught.  You're going to get convicted."

19   This isn't chilling and I'm not sure it's appropriate,

20   but as Mr. Sheketoff says to consider, that you're a

21   person who's going to disappear, but you're going to

22   apparently be given an opportunity when you get out of

23   prison to start anew.  It's going to be very important

24   that you take advantage of that.

25       I expect you will have a Probation Officer.  The

```
 1    Probation Officer will be your partner.  It's not going
 2    to be easy for you.  You've probably never lived very
 3    far from this courthouse.  It's going to be hard.  But
 4    if you go back to drugs, if you go back to crime, you're
 5    going to get locked up and whatever got you locked up
 6    again will probably add time to the supervised release.
 7    So treat your Probation Officer like your partner in
 8    this, but it's going to be hard.  I know it's going to
 9    be hard.  But in my view, you really did do something
10    very significant and risky and if 30 months is not going
11    to give you the message, then 49 months is not going to
12    give you the message either.  We'll see.
13         It's got to send a message to other people, "Don't
14    try and commit an armored car robbery," but it also,
15    this sentence is always designed to send a message to
16    those people that if you've made a big mistake like
17    that, like you made by getting involved in this, but
18    you're willing to risk your life to try to help the
19    government protect the public, that will be recognized
20    and rewarded in a significant way, too.  Two messages
21    that need to go to the public.
22         This sentence, I believe, is sufficient but no
23    more than necessary to protect the public from further
24    crimes by you, as I said.  You're going to have almost
25    another year to think about all of this.  Hopefully it
```

1    will make you even more determined not to commit any

2    more crimes.  And I think as you stand here today you

3    have that determination.

4          This is intended to give you the needed medical

5    care and other treatment that you need.  I'm going to

6    recommend that you be placed in a Bureau of Prisons'

7    facility that can offer you drug treatment and can offer

8    you mental health counseling.  I don't know if you'll be

9    there long enough to get the best that they can give

10   you, but I think you really need that.  And you should

11   be working on your GED.  You should be working on a

12   whole range of things that will give you a chance to be

13   the father and husband that I'm sure you want to be.

14         And I've, of course, taken the guidelines into

15   account.  If you hadn't started with 97 months, um,

16   maybe a lesser sentence would have been appropriate.

17   This way you started up there because of the seriousness

18   of the crime.

19         So you've earned an opportunity to have a much

20   happier future than you've had a life in the past and

21   you'll have some help from the Department of Justice in

22   getting a clean start, I gather, and from Probation in

23   taking advantage of that opportunity, but ultimately

24   it's going to be up to you.  You know, the fact that

25   something horrible happened to you when you were a kid,

1    that can't be changed.  The only thing that can change

2    is how you're going to respond to that.

3        I hope it doesn't occur to you again that you

4    should try to kill yourself.  I hope that you've --

5    despite probably having at least mixed emotions and

6    feeling some guilt about not just doing your time, that

7    you realize that you really have done something good and

8    valuable.  There may be people alive today that wouldn't

9    be alive if you hadn't come forward.  Same with

10   Mr. Owens.  I can't tell.  But I think Mr. Richardson

11   believes and has persuaded me in the other sentencings

12   that some very dangerous people are now off the street

13   for decades.  And that's a good thing.  Feel good about

14   yourself, not bad about yourself for having done that.

15   And try to always remember how determined you are today

16   never to be before me or any other judge again.  Maybe

17   that will help you, too.

18       All right.  Is there anything further with regard

19   to Mr. Lacey?

20           MR. RICHARDSON:  No, thank you, your Honor.

21           THE COURT:  Could I see Mr. Krupp and

22   Mr. Richardson at the side bar again.

23           (Side bar sealed.)

24

25

```
 1              (In open court.)

 2              THE COURT:  The Court is in recess.

 3              (Ends, 4:40 p.m.)

 4

 5              C E R T I F I C A T E

 6

 7         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 8    do hereby certify that the foregoing record is a true

 9    and accurate transcription of my stenographic notes

10    before Chief Judge Mark L. Wolf, on Monday, May 5, 2008,

11    to the best of my skill and ability.

12

13
     /s/ Richard H. Romanow
14   _____
     RICHARD H. ROMANOW
15

16

17

18

19

20

21

22

23

24

25
```